ALLEN v. CHEATUM.

1. INSURANCE—AUTOMOBILE POLICY—NONCOOPERATION OF INSURED—
   BURDEN OF PROOF—EVIDENCE.
   Finding of trial court that garnishee defendant, insurer under
   automobile insurance policy covering principal defendant's
   car at time of accident, had not sustained its burden of proof
   that insured's lack of cooperation had resulted in prejudice to
   garnishee is not disturbed, where supported by sufficient evi-
   dence, the mere showing of nonattendance at the main trial not
   being tantamount to a showing of prejudicial noncooperation
   as a matter of law.

2. APPEAL   AND   ERROR—QUESTIONS   REVIEWABLE—STATEMENT   OF
   QUESTIONS INVOLVED—GARNISHMENT—COLLUSION.
   Garnishee defendant's claim in brief on appeal that plaintiff's
   production of principal defendant, insured under garnishee's
   automobile insurance policy, was evidence of collusion is not
   considered, where such issue was not raised by the garnishee
   in its statement of questions involved on appeal from judgment
   for plaintiff on trial of the statutory issue (CL 1948,
   § 628.1 et seq.).

3. GARNISHMENT—COLLUSION—EVIDENCE—NONCOOPERATION   BY   IN-
   SURED UNDER AUTOMOBILE POLICY.
   The garnishee defendant's charge of collusion between plaintiffs
   and the principal defendant, the insured under garnishee's auto-
   mobile insurance policy, was not sustained merely by the fact
   that plaintiffs produced such principal defendant at the non-
   jury trial of the statutory issue in the garnishment proceedings
   against garnishee insurer which had withdrawn from the case
   because of alleged noncooperation of such insured (CL 1948,
   § 628.1 et seq.).

REFERENCES FOR POINTS IN HEADNOTES
[1] 3 Am Jur, Appeal and Error § 900.
[2] 3 Am Jur, Appeal and Error § 776.
[3] 29 Am Jur, Insurance § 1089.
[4, 5] 29 Am Jur, Insurance § 789.

4. Insurance—Automobile Policy—Noncooperation of Insured—
Prejudice—Presumptions.

An insurer under an automobile insurance policy does not escape
liability thereunder merely by establishing the fact of non-
cooperation of the insured, but must also show that such non-
cooperation was substantial and material and resulted in
prejudice to the insurer.

5. Same—Automobile  Policy—Noncooperation—Presumptions—
Evidence—Finding of Trier of Facts—Prejudice.

Prejudice from noncooperation by an insured under an automobile
insurance policy will not be presumed from a mere showing
of noncooperation, but the insurer must also introduce proofs
tending to show actual prejudice, and where the evidence
addduced thereon is conflicting, the Supreme Court will not
disturb the finding of the trier of the facts if it is supported
by competent evidence.

Appeal from Muskegon; Beers (Henry L.), J.
Submitted October 10, 1957. (Docket No. 32, Cal-
endar No. 47,192.)  Decided March 6, 1958.

Case by Adolph Allen and American Fidelity
Fire Insurance Company, a foreign corporation,
assignee, against Billie (sometimes called Willie)
Cheatum resulted in default judgment for plaintiffs
based on personal injuries and property damage
caused by automobile collision.  Citizens' Mutual
Automobile Insurance Company, a Michigan cor-
poration, defendant's insurance carrier, then named
as garnishee defendant, denied liability by reason
of noncooperation of principal defendant.  From
judgment against it, garnishee defendant appeals.
Affirmed.

*Floyd H. Skinner* and *Alphonse Lewis, Jr.,* for
plaintiff Allen.

*Thomas J. Whinery* for plaintiff American Fidel-
ity Fire Insurance Company.

*Hathaway, Latimer, Clink & Robb (Louis E.
Burke,* of counsel), for garnishee defendant.

VOELKER, J.   Just before dawn on May 27, 1951,
Willie Cheatum was driving along the highway in
his Ford pickup truck on his way from Flint to
his home in Muskegon.   He had had a long day,
rising early the morning before and doing a full
day's work at his trade as a cement mason in Lans-
ing, or, to put it in Willie's more colorful language,
"fanning a trowel all day."   He had then driven over
to Flint and picked up some tools and scaffolding
and also visited his "girl friend" (Willie's wife was
at home in Muskegon) and some other people and
drank some beer.   About 2 a.m. he left his friends
and started home alone.   About 5:30 a.m. as he was
nearing Muskegon his car became involved in a col-
lision with a Buick car coming from the opposite
direction owned and driven by the plaintiff Allen,
also alone.   Both drivers wound up in the hospital
and their cars in the junk yard.   Among other
things, the durable Willie received a broken kneecap,
a broken neck and a fractured skull.

At the time of the accident there was in force an
insurance policy covering public liability and prop-
erty damage issued by the garnishee defendant to
Willie Cheatum.   This policy contained a "coopera-
tion" clause, of which more presently.   On May
11, 1954, plaintiff Allen and his insurance company
filed suit for damages against Willie Cheatum, al-
leging in substance that Willie was driving on the
wrong side of the road and not tending to where
he was going.   Willie through his attorneys (the
same counsel who now appear for the garnishee
defendant) answered denying any negligence or lia-
bility and, following several continuances, includ-
ing a final continuance at the request of defense
counsel because of the nonappearance of Willie, the
case came up for trial on April 17, 1956.

At this juncture the defense made another motion
for continuance because of Willie Cheatum's ab-

sence, which the court denied, whereupon the defense attorneys moved to withdraw from the case, which motion was granted. The plaintiffs then proceeded with their uncontested proofs to judgment before the court without a jury.

During this trial the plaintiff Allen testified among other things as follows concerning the driving and deportment and certain utterances of Willie Cheatum:

"When he come on my side of the road, which he was already on my side, when he got near this driveway, the west end, as you say, to the filling station, that's when I discovered that he was asleep then, which is approximately 25—20 or 25 feet, and he slumped—if he would have kept going the direction he was going he would have went completely off before he got to me, but as he slumped the car kind of straightened up and come directly to me head on. And that's when I tried to get away from him to my left."

And again further on:

"I asked him did he remember what woke him up, whether the horn woke him up or not, and he said he didn't think so, he thought the lights woke him up."

After judgment the present garnishment proceedings were started against Willie Cheatum and his insurance company under the statute.* The case was heard by the court without a jury. The insurance company defended specially on the ground that its assured had failed to cooperate in the preparation for the main trial and also in failing to attend, testify and give assistance at the trial under the following clause in its policy:

* See CL 1948, § 628.1 *et seq.* (Stat Ann § 27.1855 *et seq.*).—RE-PORTER.

"The assured shall cooperate with the company and, upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits, and the company shall reimburse the assured for any reasonable expense, other than loss of earnings, incurred at the company's request. The assured shall not, except at his own cost, voluntarily make any payment, assume any obligations or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident."

Judgment went for the plaintiffs below in the garnishment proceedings and this appeal has resulted. In support of its position that the failure of its assured to cooperate constituted a prejudicial breach of the quoted provision in his contract avoiding liability to plaintiffs under the policy, the defendant insurance company made certain proofs below tending to show wherein Willie was uncooperative, including the following: that it did not see its assured after May, 1954, when he came to the office of its counsel to help prepare the answer to the main suit; that shortly thereafter he left his home without notifying counsel or leaving any forwarding address; that both his wife and counsel lost track of him, the former hearing nothing from him for more than a year; that on June 30, 1954, counsel wrote him at his home address to come in and aid in preparation of a cross-declaration, to which he never responded; that on January 31, 1955, counsel wrote him to come to the office to confer on a pretrial conference, which he failed to do, thus resulting in the trial court's refusal to permit counsel to take plaintiff Allen's deposition for purposes of discovery; that on February 9, 1956, counsel again wrote him informing him of the trial

date on March 1, 1956, warning that his failure to cooperate would void his policy; and that none of these letters was returned or answered.

Garnishee defendant further showed that counsel "contacted" Mrs. Cheatum on February 18th, who then informed them that Lansing was Willie's last known address, but that the letters she had forwarded to him there had been returned marked that he had moved and left no forwarding address; that investigations to turn up the missing Willie were made by counsel in Lansing and Flint, but proved fruitless; that thereupon counsel moved for a continuance, which was granted until April 17, 1956.

The record discloses that early in March counsel for the plaintiff Allen gave defense counsel 3 possible addresses, and that one of the 3 registered letters thereafter written by insurance company counsel to Willie at these addresses finally reached him in Chicago on March 10, 1956. Garnishee's counsel also then "contacted" him through a Chicago investigator and Willie still remained vague as to whether he would or would not attend the trial or whether he needed to, his attitude being in effect that one could not squeeze blood out of a turnip.

The record before us also discloses that the defendant Cheatum, however uncooperative otherwise, freely talked about the case to almost anyone who approached him and that he gave a number of oral and written statements to both sides. These written statements are in the record and, to put it charitably, appear rather vague as to how the accident happened or precisely where Mr. Cheatum's car was on the highway. There are some inconsistencies in them but throughout Willie pretty consistently maintained that just before the accident he was looking down at his speedometer and then looked up to see the Allen car some 10 or 15 feet from him. We also note in passing that the record indicates that he later paid

a fine for driving over the centerline; also that he was overheard by the plaintiff Allen telling his wife in the hospital that he must have fallen asleep. Cheatum was a plaintiffs' witness at the trial of the statutory issue and was examined by both sides and did not deny making this last statement about slumbering at the wheel. A former State trooper also appeared and testified at the garnishment trial that Willie had told him he did not recall what happened and had no memory of the accident at the time he was questioned.

The record also discloses that on his own initiative Willie Cheatum communicated with and discussed the accident with the company's adjuster several weeks after the accident and that again in 1954 he lost several days work in travelling to the head office in Grand Rapids and back to Muskegon to talk with a lawyer for his insurance company and that he, Willie, after his conversation with this lawyer, thought he was through and needn't come back. On this subject he testified at the garnishment proceedings as follows, when asked about his conversation with the insurance company attorney:

"He told me that when I signed the statement that I was through with it, I didn't have to come, he didn't need me any more. He told me that in his office when I signed the statement, he said that that would be all."

He then identified the same lawyer as being present in court and continued:

"He told me I didn't have to be bothered, I wouldn't have to lose no more time, because I lost 3 days that time coming over here; and he told me that was all I would have to do, that was all he needed."

He was then asked if he had relied on this attorney's statement that they wouldn't need him any more, to which he replied:

"That's right, he told me that himself in person,. that fellow right there (indicating)."

We can find no place in this record where this: testimony is rebutted by sworn testimony, although· this same attorney had on his own initiative tes-- tified earlier in the garnishment proceeding on other· matters. Following this testimony by Cheatum plaintiff Allen's attorney asked him the following· question and received the following answer:

"*Q.* Now, witness, had you appeared on the 17th· [at the main trial] would your testimony have been· any different about the manner of the accident?"
"*A.* It would have been the same thing, because· that was the only thing that happened. That is the· only thing you could tell."

Garnishee defendant is at some pains · in citing·, cases and seeking to persuade us how important the· cooperation and presence of the defendant at counsel table is to the proper defense of a case. We scarcely need to be persuaded on this score as we are already quite aware that such cooperation and such pres- ence is not only important in most cases but usually crucial. On the other hand we are equally aware· that there are occasional situations where such presence may not only fail to help the defense but might only serve to make a bad situation worse. We· do not think it is necessary for us to find or hold that this is such a situation. We think it is sufficient for us to say that there are rather plain indications· and inferences in this record that such could be the· case, and that the trial court had sufficient facts be-- fore it to reach a valid conclusion that the garnishee· defendant had not met the required burden of show-- ing that the lack of cooperation by its assured result- ed in prejudice to the company. We cannot adopt the view that is apparently urged here that a mere· showing of nonattendance of the assured is tanta--

mount to a showing of prejudicial noncooperation
as a matter of law.

There are still other indications to show how
genuinely burning or not was the presently claimed
desire of the insurance company to actually have
Willie Cheatum on hand for the main trial. For
example, during the trial on the statutory issue the
trial judge, upon learning that Willie Cheatum was
present in court as a witness for the plaintiffs im-
mediately offered to set aside the judgment in the
main case and slate it for early trial, either jury or
nonjury. To this plaintiffs promptly agreed but,
after first agreeing, the garnishee defendant later
declined unless it could be assured that Willie would
actually be on hand for the new trial. It also appears
that it then made no effort to subpoena him. It now
argues that once there was actual noncooperation
by its assured its policy obligations were over and
could not be revived by any belated offer to co-
operate. Granted, but we think it rather revealing
on the issue of whether there was *prejudicial* non-
cooperation here that the company would so peremp-
torily pass up the opportunity to get to defend from
scratch the case on the merits if it actually felt that
there was in turn any real chance to do so success-
fully, or that the presence of their assured at the
counsel table would have materially changed the
result.

The trial court had these bluntly penetrating
things to say on this score in its opinion:

"After listening to all of the testimony in this case
and reading the statements and exhibits, I cannot
help but reach the conclusion that the garnishee de-
fendant realized that if the defendant Cheatum ap-
peared and was sworn as a witness his testimony
would be very damaging to the defendants' case and
would no doubt result in a judgment in favor of
the plaintiff because from the statements, et cetera,

·taken it appears that on several occasions he had admitted that at the time of the accident he had gone to sleep at the wheel of the automobile, and the further conclusion is inescapable that the garnishee defendant, like a drowning man, is bent on clinging at all hazards to the straw of noncooperation to avoid liability under its insurance contract. I know of no rule that compels an insured to ʼcooperate with the insurance company to the extent that he commits perjury, and the fact that the insurance company knows that his testimony will be damaging gives it no right whatever to continue to claim under those circumstances a breach of contract because of noncooperation."

In addition to what we have already indicated, there is no showing that the company or its lawyers ever seriously tried, while Willie *was* available and "cooperating," to impress upon their obviously happy-go-lucky and lighthearted assured the importance of his appearing at the trial (the only evidence is quite the other way), or even that he should keep them posted as to his whereabouts. We have already noted that it was the plaintiff's own attorney who finally gave them the last minute lead to track him down—a lead which under the circumstances the company and its lawyers could scarcely afford to ignore.

As for Willie himself and his failure and quite evident reluctance to proceed from Chicago to the main trial, we have already mentioned his unrebutted conversation with the insurance company lawyer back in 1954. In addition, perhaps Willie had not yet forgotten the 3 days' work he had lost at that time (not reimbursable under the policy) and the general shunting around he had received on this last occasion that he had tried to "cooperate" with his insurer—while here, some 3 years later, was the mysterious and ominous (and still unreimbursable)

trial itself, the duration of which a wiser man than Willie might have had grave trouble in predicting.

Appellant insurance company suggests in its brief that the additional fact that the plaintiffs themselves finally produced Willie Cheatum in court is evidence of collusion. The ready answer to that is that this issue was not raised by it here in its statement of questions involved. Plaintiffs also seek to rely on the failure of the insurance company to plead collusion below, but the company could scarcely be expected to have pleaded collusion by production of the assured by the plaintiffs where the assured was not produced until the midst of the actual trial of the statutory issue. In any event, when a defendant relies on noncooperation based upon its inability to find its assured and his ultimate failure to appear in court, one practical way—if not sometimes the only way—the plaintiff has to resist such a defense is, if he can, to himself produce the missing assured. Mere production of the assured under these circumstances is not itself sufficient evidence of collusion. Any other rule would make such a defense of noncooperation virtually unbeatable: if the assured didn't show up, the insurance company prevails because of noncooperation; if the plaintiff himself dares produce him, the company still prevails because of collusion. Such an automatic result we do not think is good law. The record before us does not sustain the charge of collusion.

On the main issue, whatever the law may be elsewhere, in Michigan we seem committed to the rule that in order for an insurance company to successfully claim noncooperation of its assured as a defense in these situations, it not only has the burden of showing such lack of cooperation but also that it was prejudicial. This question is generally one of fact and if the trier of the facts finds against the insurer, and that finding is supported by competent proofs,

we do not usually disturb the result. As Mr. Justice CARR said in *Leach* v. *Fisher,* 345 Mich 65 at 72:

"Assuming the fact of noncooperation, the principal issue presented for determination relates to the matter of prejudice. As indicated by the verdicts returned, the jury determined such issue in favor of the plaintiffs."

See, also, *Bernadich* v. *Bernadich,* 287 Mich 137; and *Kennedy* v. *Dashner,* 319 Mich 491 (claimed failure to give prompt notice of the accident).

In 8 Appleman, Insurance Law and Practice, § 4773, it is said:

"The insured's lack of cooperation must be substantial and material to result in a breach of the policy condition. Some courts have adopted the rule that the insured's violation of a cooperation clause constitutes a defense to the insurer, only where it can show that it was substantially prejudiced by such violation. Such a rule is probably salutary where it is evident that the insured's infraction did not seriously impair the insurer's investigation or defense of the action."

Appleman goes on to say that if the rule is carried too far it would put an "insurmountable burden" upon the insurer of showing that the verdict was the result of lack of cooperation. He finally plumps for the California rule, whereupon a showing of breach of the cooperation clause, prejudice will be presumed. Our rejection of the California rule is not to place an "insurmountable burden" upon the insurer, Appleman to the contrary notwithstanding. The Michigan rule is simply that where an insurer pleads noncooperation prejudice will not be presumed from a mere showing of noncooperation, but the insurer must also introduce proofs tending to show actual prejudice, and further—and this is the nub of this case—that where the evidence on

this score is conflicting, this Court will not disturb the finding of the trier of the facts if it is supported by competent evidence.

In jurisdictions where a showing of prejudice is required it is usually inevitable that the merits of the main case must be gone into to some extent when the defense of noncooperation is raised. That is frequently the only way the triers of the facts can intelligently appraise and determine whether actual prejudice did or did not exist. Upon appeal we conceive we must in turn review the evidence tending to show prejudice to the insurer or the lack of it, not to the end of substituting our judgment for that of the trier of the facts, but simply to find out whether he (or the jury, if there was one) had sufficient competent evidence before him to reach the result that he reached.

Any other rule might tempt some insurance companies (present company, of course, excepted) to be less concerned with defending or settling their claims than with subtly encouraging certain of their less desirable risks to "get lost" and stay lost while at the same time building a plausible if perfunctory record for an ultimate claim of noncooperation. The more desperate the claim the more temptation might exist, a situation which in turn would not notably be relieved by the generally clogged state of our trial dockets. In the miraculous and possibly embarrassing event that at the last minute the lost should become found, still other companies (present company still excepted) might likewise be tempted to visit them with investigators or pelt them with elaborate legalistic communications filled with peremptory demands and dire forebodings more shrewdly calculated to drive or freeze their man into a state of noncooperation than to produce him in court. We are confident that no one connected with this case would

want this Court by its decisions to encourage such a wry state of affairs.

In view of the foregoing we do not feel compelled to discuss the other matters sought to be raised in the briefs of counsel. The judgment below must be affirmed, with costs to appellees.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, and EDWARDS, JJ., concurred.

KAVANAGH, J., took no part in the decision of this case.