AETNA CASUALTY & SURETY
CO., Plaintiff,

v.

DOW CHEMICAL COMPANY,
Defendant.

No. 93–73601.

United States District Court,
E.D. Michigan,
Southern Division.

June 8, 1998.

Charles Browning, Detroit, MI, for Plaintiff.

Michael P. Foradas, Stephen P. Jeffirs, Kirkland & Ellis, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER (1) DENYING ZURICH'S MOTION FOR SUMMARY JUDGMENT ON LATE NOTICE; (2) GRANTING IN PART AND DENYING IN PART FIREMAN'S FUND'S MOTION FOR SUMMARY JUDGMENT CONCERNING DOW'S FAILURE TO COMPLY WITH NOTICE PROVISIONS; (3) GRANTING IN PART AND DENYING IN PART TRAVELERS/AETNA'S COUNTER–MOTION FOR SUMMARY JUDGMENT BASED ON THE LATE NOTICE PROVISIONS IN ITS POLICIES; (4) DENYING THE LONDON EXCESS INSURERS' REQUEST IN THEIR JOINDER FOR SUMMARY JUDGMENT BASED ON THE LATE NOTICE PROVISIONS IN THEIR EXCESS POLICIES; (5) DENYING FIREMAN'S FUND'S MOTION FOR SUMMARY JUDGMENT ON VOLUNTARY PAYMENT; AND (6) DENYING DOW'S CROSS–MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF VOLUNTARY PAYMENT**

EDMUNDS, District Judge.

This litigation arises out of an environmental insurance dispute. Dow seeks indemnification coverage under a series of comprehensive general liability ("CGL") policies issued to it between 1944 and 1985 and indemnification coverage under excess coverage policies it began purchasing in 1955. Several of Dow's primary insurers, Zurich, Fireman's Fund, and Travelers/Aetna (collectively "Insurers"), have filed motions for summary judgment asserting that Dow's notice of "occurrences," "claims," or "suits" was untimely as a matter of law and caused them prejudice as a matter of law thus precluding indemnification under Dow's policies. Dow responds that Insurers are not entitled to summary judgment because: (1) they have not established that Dow's notice was untimely as a matter of law; and (2) even if determined to be untimely, Insurers have not shown that they were prejudiced by Dow's allegedly untimely notice as a matter of law.

Fireman's Fund has also filed a motion for summary judgment asserting that Dow is not entitled to any indemnification for many of the claims relating to 7 of the 10 Final Sites because Dow breached the voluntary payments clause of its policies. Dow has filed a cross-motion on this issue arguing that: (1) Dow's payments were not "voluntary;" and (2) even if determined to be "voluntary," Michigan law will require Insurers to show that Dow's actions caused them material prejudice, and Insurers cannot show material prejudice.

For the reasons stated below, this Court: (1) DENIES Zurich's motion for summary judgment on late notice; (2) GRANTS IN PART and DENIES IN PART Fireman's Fund's motion for summary judgment concerning Dow's failure to comply with notice conditions; (3) GRANTS IN PART and DENIES IN PART Travelers/Aetna's counter-motion for summary judgment based on the late notice provisions in its policies; (4) DENIES the London Excess Insurers' request in their Joinder for summary judgment based on the late notice provisions in their excess policies; (5) DENIES Fireman's Fund's motion for summary judgment on voluntary payment; and (6) DENIES Dow's cross-motion for summary judgment on the issue of voluntary payment.

Primary Insurers have established, as a matter of law, that Dow's delayed notice actually prejudiced them with regard to claims involved at the Harris/Farley Street site and the Conalco site but have not met their burden with regard to claims involved at the remaining sites. Questions of material fact regarding prejudice also preclude summary judgment on the issue of voluntary payment and the London Excess Insurers' right to summary judgment on the issue of late notice.

## I. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed.R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505. The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505.

## II. Analysis

### A. Insurers' "Late Notice" Motions for Summary Judgment

Primary Insurers Zurich (3/28/49–3/28/50), Fireman's Fund (11/19/56–4/1/76), and Travelers/Aetna (Travelers 1950–1956; Aetna 1976–1983, 1983–1985) seek to avoid indemnification coverage for many of the claims at the Final Sites on the ground that Dow's notice was untimely as a matter of law and caused them prejudice as a matter of law. Zurich's motion addresses only the Cliffs–Dow site. Fireman's Fund's motion addresses each Final Site except the Brookhurst, Wyoming site. Travelers/Aetna's motion addresses all ten Final Sites. Century has joined Travelers/Aetna's motion and several reply briefs and has filed a separate reply. Century's primary policies (1944–1949) are implicated solely at the Cliffs–Dow site.

Some Excess Insurers have filed Joinders. Fireman's Fund's motion has been joined by Interstate Fire & Casualty, Centennial Insurance Co., and Continental Casualty Co. Travelers/Aetna's motion is joined by the AIG Defendants (American Home Assurance Co., Insurance Co. of the State of Pennsylvania, and Union Fire Ins. Co.), Century's "Certain Defendants" (identified in Century's 9/25/97 cross-motion for summary judgment), and the London Excess Insurers (identified in their Joinder) with respect to the Conalco and PPI Sites only.

### 1. Relevant Policy Language

At issue here are the notice provisions for "occurrences" and "claims" or "suits" contained in the CGL primary and excess policies issued to Dow. There are some important language differences in the notice provisions contained in the primary as opposed to excess policies as well as some language differences in the 1983–1985 Aetna primary policies as opposed to the earlier Aetna primary policies. These differences are addressed below.

Fireman's Fund issued six CGL policies to Dow which were in effect from November 19, 1956 through April 1, 1976. As to "occurrences", the early policies require notice "as soon as practicable" "upon the happening of an occurrence or an accident." *See* FF Notice Br., Ex. 2. The policies in effect from 1964 through 1976 require notice of an occurrence or accident as soon as practicable "after such occurrence or accident has been reported *to [Dow]'s insurance or legal department.*" *See* FF Notice Br., Ex. 1. (Emphasis added).[1] As to "claims" or "suits," the

---

1. The provisions in Century's primary policies (6/1/44—3/28/49) are substantially similar. *See* Century 9/25/97 cross-motion for summary judgment at 11–13, 16.

policies uniformly provide that: "[i]f claim is made or suit is brought against the insured, the insured shall immediately forward to the Company or any of its authorized agents every demand, notice, summons or other process received by the insured or the insured's representatives." *See* FF Notice Br., Ex. 2.

There is only one Zurich policy at issue here; a CGL policy issued to Dow which was in effect from March 28, 1949 to March 28, 1950. It similarly requires notice of an occurrence as soon as practicable and requires Dow to immediately forward to Zurich "every demand, notice, summons or other process" if "claim is made or suit is brought" against Dow. *See* Zurich Br., Ex. 3. Travelers' CGL policies, covering the period from March 28, 1950 through November 19, 1956, likewise require notice of an occurrence as soon as practicable and require Dow to immediately forward any claim or suit brought against Dow. *See* Trav. Notice Br., Ex. 2.

Aetna's CGL policies issued to Dow covering the period from April 1, 1976 through April 1, 1983 contain language similar to that in Fireman's Fund's policies covering the period from 1964 through 1976; i.e., they require notice of an occurrence "as soon as practicable, *after such occurrence or accident has been reported to the insured's corporate insurance or legal department at its office in Midland, Michigan.*" *See* Trav. Notice Br., Ex. 1. (Emphasis added). Aetna's 1976–1983 policies also require that Dow "immediately forward" to it "every demand, notice, summons or other process received" by Dow if a "claim is made or suit is brought" against Dow. *Id.*

Aetna's policies covering the period from April 1, 1983 through April 1, 1985 also contain an endorsement which modifies the above language as to notice of an occurrence as follows:

> *Whenever the Manager of Liability Insurance* in the Corporate Insurance Department, located at the General Office of the Dow Chemical Company at Midland, Michigan, 48640, *has information from which the insured may reasonably conclude that an occurrence covered hereunder involves* injuries or *damages* which, in event that the insured should be held liable, *is likely to involve this policy, notice shall be sent* to either the Aetna Casualty & Surety Company or Marsh & McLennan, (One Woodward Avenue, Detroit, Michigan 48226) as soon as practicable, *provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim.* (Emphasis added).

*Id.*

Dow's excess policies generally provide that notice is not required unless it appears that the excess policies are likely to be implicated. The London Excess Insurers' policies in effect from 1956 through 1958 provide that Dow is to give notice when it has "knowledge of any occurrence likely to give rise to a claim hereunder." *See* London Excess Insurers Joinder, Ex. H.[2] The language contained in the London Excess Insurers' policies in effect from 1958 through 1979 is substantially similar to that contained in the Aetna 1983–1985 CGL primary policies; i.e., Dow is to give notice when it "has information from which the Assured *may reasonably conclude* that an occurrence covered hereunder involves injuries or damages which, in the event that the Assured should be held liable, *is likely to involve this Policy.*" *Id.* (Emphasis added). Additional London excess policies in effect from 1975 through 1986 also have substantially similar notice provisions. *Id.* The vast majority of the London excess policies; i.e., those in effect from 1958 through 1986, contain a saving provision

---

**2.** Centennial's excess policy similarly provides that the insured "shall immediately advise the company of any occurrence which will probably result in liability under this certificate." *See* Centennial Joinder, Ex. A.

Century's Certain Defendants' excess policies (12/1/84—12/1/95) similarly provide that the insured shall notify the insurer "in the event of an occurrence, reasonably likely to exceed the retained limit." They further provide that the insured shall immediately forward all claims and suits brought against it. *See* Century 9/25/97 cross-motion for summary judgment, Ex. 2. Additional Century Certain Defendants' excess policies (6/11/72–7/11/75; 6/11/75–6/11/78; 6/11/75–10/2/76) have notice provisions in a form that follows that in the designated underlying insurance. *Id.*

which duplicates that found in the Aetna 1983–1985 primary policies and provides that "failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, *shall not prejudice such claims.*" *Id.* (Emphasis added).

## 2. The Insurers' Late Notice Defense

In their motions for summary judgment, Insurers argue that Dow's notice to them of occurrences, claims and suits was untimely, and thus Dow breached a condition precedent to coverage. Insurers further argue that Michigan law presumes prejudice under circumstances such as these where there are long delays before notice is provided; and, even if prejudice is not presumed, Insurers have established that Dow's untimely notice resulted in actual prejudice thus precluding indemnification under Dow's policies. Travelers/Aetna and Century further argue that notice to one of the primary insurers is not sufficient to obviate untimely notice and its resulting prejudice as to another.

Dow responds that Insurers have not met their summary judgment burden by showing, as a matter of law, that Dow's notice was untimely or that its notice, if found to be untimely, caused Insurers to suffer actual prejudice to their position. Specifically, Dow argues that: (1) Michigan law requires only that notice be provided within a reasonable time under the circumstances; (2) Dow's notice to Primary Insurers was reasonable as to the third-party suits at issue because it timely notified at least one of its primary insurers; (3) Dow's notice to Primary Insurers was reasonable as to the governmental agency actions because substantial uncertainties existed regarding the nature of Dow's potential underlying liability and whether such liability was covered by its insurance policies and Dow gave notice as soon as it determined the uncertainties had disappeared; (4) Dow's notice to Excess Insurers was timely because it was given once it appeared that coverage was likely to be implicated; (5) even if Dow's notice was untimely, Michigan law will not presume prejudice; and (6) Insurers have not demonstrated that they were actually prejudiced by Dow's untimely notice.

## 3. Michigan Law Requires An Insurer to Establish that Notice was Untimely and that It Suffered Actual Prejudice to Its Position as a Result of the Delayed Notice

### a. Typical Primary Policy Notice Provisions Require Notice Within a Reasonable Time

■ Michigan law recognizes that the notice provisions in an insurance policy are designed to "allow the insurer to make a timely investigation ... in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims." *Wendel v. Swanberg,* 384 Mich. 468, 477, 185 N.W.2d 348 (1971). Michigan law construes policy language requiring the insured to give notice "immediately" or "as soon as practicable" as requiring notice "within a reasonable time." *Burgess v. American Fidelity Fire Ins. Co.,* 107 Mich.App. 625, 628, 310 N.W.2d 23, 25 (1981); *Kennedy v. Dashner,* 319 Mich. 491, 493–94, 30 N.W.2d 46, 47 (1947). Accordingly, notice is timely under Dow's typical primary CGL policies if it is provided within "a reasonable time, dependent upon the facts and circumstances of the case." *Motor State Ins. Co. v. Benton,* 35 Mich.App. 287, 290, 192 N.W.2d 385, 387 (1971) (quoting *Kennedy,* 319 Mich. at 494, 30 N.W.2d at 47). *See also Kravat v. Indemnity Ins. Co. of N. Amer.,* 152 F.2d 336, 338 (6th Cir.1945) (applying Michigan law).

### b. Notice Provisions Under the Excess Policies Require A Different Interpretation

As the court observed in *Employers' Liability Assurance Corp., Ltd. v. Hoechst Celanese Corp,.* "[w]ith multiple sites, multiple insurers, and multiple policies providing various layers of excess insurance for varying periods of time," it is important to recognize that "the terms of the notice clauses of the excess policies need to be sharply distinguished from the notice provisions of primary policies." 43 Mass.App.Ct. 465, 684 N.E.2d 600, 605 (1997). In this case, we also need to distinguish the notice language contained in Aetna's 1983–1985 primary policies from the provisions contained in the earlier Aetna policies.

■ In contrast to the typical notice provision of a primary CGL policy, many of the notice provisions in Dow's excess policies require the insurer to show that the insured "had information or had formed an opinion at a particular time that a claim would implicate" the policy and "then failed to notify the insurer for an unreasonable period thereafter." *Id.* at 606. The "rubbery language" of these provisions is designed to give "the insured some leeway or discretion in forming a judgment about when … protection is implicated." *Id.* This intent is elucidated in the "saving proviso" also contained in these notice clauses; i.e., "failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claim." *Id.* This language precludes Insurers from using hindsight to support a late notice defense.

As the *Hoechst* court further observed, in the context of excess policies:

> this looseness responds to the realities of the situations that most often confront the policyholders in these environmental cases. Take remediation. The nature and causes of environmental threats may not be instantly apparent. The contemplated costs of cleanup may vary as findings are progressively made and technical analysis proceeds. The unexpected regularly obtrudes. The attitudes and requirements of regulatory agencies are not constant and the changes and variations must affect the estimates.

*Id.*

■ Dow's excess policies generally provide that notice is not required unless it appears that the excess policies are likely to be implicated. The vast majority of the London excess policies; i.e., those in effect from 1958 through 1986, have notice clauses with "rubbery language" and saving provisions substantially similar to that discussed in *Hoechst*. Accordingly, to succeed on their late notice motions, Excess Insurers with policies containing this language must establish, without the benefit of hindsight, that Dow was required to provide notice and did not do so within a reasonable time. The same applies as to Aetna's 1983–1985 primary policies.

### c. The Reasonableness of Dow's Notice Decisions is Not the Proper Inquiry When Determining Timely Notice Under Dow's Typical Primary CGL Insurance Policies

■ The Court is not persuaded by Dow's argument that the reasonableness of its notice decisions is the proper inquiry when determining whether Dow provided timely notice to Insurers. Dow takes Michigan's "timely notice is notice that is provided within a reasonable time" principle and redirects the reasonableness question. Rather than focusing on when the insured had notice of an occurrence, claim or suit; when the insured notified the insurer; and asking whether the insurer was prejudiced by any delay in providing notice, Dow urges the Court to focus instead on the reasonableness of the insured's notice decisions.

■ Dow argues that its notice decisions regarding third party suits were reasonable because it reasonably concluded that it could select which of its primary insurers it would notify and reasonably concluded that that primary insurer would then seek contribution from the other insurers if it so desired. Dow further argues that its notice decisions regarding governmental agency environmental actions were reasonable because it gave notice to Insurers once it determined that the legal uncertainties and coverage questions, which existed when these actions first arose, were sufficiently settled and coverage was available. Dow also argues that its notice decisions as to these governmental agency actions were reasonable because Insurers' routine and repeated coverage denials; i.e., asserting PRP letters were not "suits" for "damages", led Dow to reasonably conclude that notice to Insurers would be futile prior to the time it finally did provide notice. This Court rejects Dow's approach to the timely notice issue.

Dow has not persuaded this Court that the Michigan Supreme Court would interpret the typical notice language provided in its primary CGL policies in the manner Dow proposes. Dow points to no policy language or case law that supports its argument that notice provided to one primary insurer suffices as notice to all other insurers and precludes those other insurers from successfully asserting a late notice defense to their duty

to indemnify. Dow cites no Michigan case law which interprets the relevant notice language as permitting the insured to unilaterally decide whether and when coverage is available and to unilaterally decide which of its insurers it will notify simply because those decisions may be "reasonable" under the circumstances.

Under Dow's approach, an insurer would be obligated to provide indemnification coverage no matter how long it took the insured to decide the law was sufficiently settled and coverage was available and no matter how much prejudice this delay actually caused the insurer. To adopt Dow's approach, the Court would be forced to ignore the interests the notice provisions were designed to protect. This is something it cannot do. The prejudice requirement was created to prevent forfeitures while also honoring the protections the notice provisions provide to insurers.

■ Dow's reliance on decisions from states that do not require the insurer to show that it has been prejudiced by the insured's late notice to avoid indemnification, is misplaced. *See Avondale v. Travelers Indemnity*, 774 F.Supp. 1416, 1429 (S.D.N.Y.1991); *Ins. Co. of N. Amer. v. Waldroup*, 462 F.Supp. 161, 162 (M.D.Ga.1978). The decisions Dow cites demonstrate that, in states where there is no prejudice requirement to protect against forfeiture, an insured's reasonable and justifiable belief of non-coverage serves as a "mitigating circumstance" which will excuse delayed notice. *See Avondale*, 774 F.Supp. at 1431. Michigan law, which excuses late notice when the insurer fails to show that the late notice actually prejudiced its position, does not also excuse late notice based solely on the insured's unilateral belief that coverage was unavailable.

To construe the primary CGL notice clauses it in the manner Dow proposes; i.e., to include the broader, more flexible language typically found in Dow's excess policies or that found in Dow's 1983–1985 Aetna primary CGL policies, would require the Court to effectively rewrite the notice provisions.

.This too is something the Court cannot do under Michigan law. This is not to say that Dow must provide notice of events that it did not know were "occurrences" at the time they occurred. Likewise, Dow is not precluded from showing how different policy language; i.e., that contained in Dow's 1983–1985 Aetna primary CGL policies and Dow's excess insurance policies, may require the Court to consider the reasonableness of Dow's conclusion that its policies were or were not implicated and Dow's related decisions concerning whether and when it should provide notice to its insurers.

### d. Prejudice Requirement

■ It is a well-established principle of Michigan law that untimely notice will not excuse an insurer's obligation to indemnify unless it can prove it was actually and materially prejudiced by the insured's delay. *Wendel*, 384 Mich. at 478–79, 185 N.W.2d at 353; *Weller v. Cummins*, 330 Mich. 286, 47 N.W.2d 612 (1951); *Kleit v. Saad*, 153 Mich. App. 52, 395 N.W.2d 8 (1985); *Burgess*, 107 Mich.App. at 628–29, 310 N.W.2d at 24–25. As the *Wendel* Court observed, Michigan law, which disfavors forfeitures, recognizes that "prejudice to the insurer is a material element in determining whether notice is reasonably given (citation omitted) and the burden is on the insurer to demonstrate such prejudice." *Wendel*, 384 Mich. at 478, 185 N.W.2d at 353. Accordingly, to succeed on their late notice defense and to avoid indemnification, Insurers must establish that: (1) Dow breached the notice provisions by not providing notice within a reasonable time; and (2) Dow's breach caused the Insurers to suffer actual prejudice.

The above general principles were recently reaffirmed by the Michigan Supreme Court. In *Koski v. Allstate Ins. Co.*, 456 Mich. 439, 572 N.W.2d 636 (1998), the Court determined that untimely notice of a lawsuit, despite timely notice of the claim giving rise to the suit, barred coverage where the insurer showed that it was actually prejudiced by the delayed notice of the lawsuit.[3] Initially, the

---

**3.** The underlying facts of *Koski* involve a lawsuit seeking damages for an intrafamily tort, and an insured's attempt to have his insurer provide coverage for a default judgment that was entered against him. In October, 1984, Mr. Koski's mi-

nor daughter was injured at their home when he accidentally drove a garden tractor over her foot. Mr. Koski promptly filed a claim with his insurer who responded that coverage did not exist due to

Michigan Supreme Court observed that, although the notice provisions were conditions precedent, "it is a well-established principle that an insurer who seeks to cut off responsibility on the ground that its insured did not comply with a contract provision requiring notice immediately or within a reasonable time *must establish actual prejudice to its position.*" 572 N.W.2d at 639 (citing *Weller v. Cummins, Wendel v. Swanberg,* and Windt, Insurance Claims & Disputes (3d ed), § 3.05, p. 123) (emphasis added). The Court further observed that "[o]ne of the purposes of the provision requiring notice ... is to give the insurance company knowledge ... *so that it can make a timely investigation in order to protect its interests ....* It follows that if the insurance company received adequate and timely information of the accident or the institution of an action for the recovery of damages *it is not prejudiced, regardless of the source of its information.*" *Id.* (quoting *Weller,* 330 Mich. at 293, 47 N.W.2d 612) (emphasis added).

The *Koski* Court then held that the insurer had established that its position had been prejudiced by the insured's delay in notifying it about the suit until three months after entry of the default judgment because: (1) the delay precluded the insurer from contesting liability or damages, and (2) precluded the insurer from challenging entry of the default judgment. The Court observed that, as to (1) above, the insurer "never received any information before the default that plaintiff had been sued," and there was nothing in the record indicating the insurer would have

refused to defend the suit under a reservation of rights despite the insurer's initial denial of the claim. *Koski,* 572 N.W.2d at 640.[4] As to (2) above, the Court observed that, because the crucial 21–day period under Michigan law had lapsed before notice was provided, the insurer would have to establish extraordinary circumstances to set aside the default, and those extraordinary circumstances did not exist in *Koski. Id.*

*Koski* teaches that an insured's notice of an occurrence or a claim does not excuse a subsequent failure to timely notify the insurer of a suit that arises out of that same occurrence or claim. It likewise teaches that an insured cannot presume that a denial of a claim can be used to support a presumption that the insurer will also deny coverage for a subsequent lawsuit.[5] More importantly, *Koski* reaffirms the principle that Michigan law will not cut off the insurer's responsibility to provide coverage under a policy unless it establishes "actual prejudice to its position." *Id.,* 572 N.W.2d at 639.

**(1) Michigan Law Does Not Presume Prejudice Based Solely on the Length of Delay in Providing Notice**

■ *Contrary to the Insurers' argument* here, Michigan law does not presume the insurer has been prejudiced simply by observing the length of the delay in providing notice. Careful examination of Michigan precedent reveals that the courts have invariably found actual prejudice before allowing the insurer to avoid its duty to indemnify.

a new 1982 exclusion for intrafamily accidents. The minor daughter's attorney also contacted the insurer in 1986 regarding settlement of the claim, and the insurer once again denied coverage for the same reason. In 1987, the daughter, with her mother acting as her next friend, filed a tort suit against her father. The father did not notify his insurer of the lawsuit, and he never responded to the suit. On February 5, 1990, a default judgment was entered against the father. Three months later, the insured's attorney notified his insurer and demanded payment of the default judgment. In October, 1990, the father filed a declaratory judgment action against his insurer. The trial court and court of appeals determined that the insurer had not been prejudiced by the insured's untimely notice because the insurer had notice of the claim which gave rise to the lawsuit. The insurer appealed, and the Michigan Supreme Court reversed.

4. The Court cautioned, however, that "an insurer who knows of legal proceedings instituted against its insured, but nevertheless chooses to rest on its claim of noncoverage, faces a heavy burden in demonstrating prejudice from its insured's failure to comply with a notice provision." *Koski,* 572 N.W.2d at 640, n. 7.

5. This Court acknowledges that the underlying facts of *Koski*—a young daughter suing her father for injuries she suffered as a result of a lawn tractor accident at their home—and the Michigan Supreme Court's intolerance for collusive lawsuits skews what the courts, facing late notice circumstances such as those presented here, may extrapolate from *Koski.*

This principle was recently illustrated in *Koski* where the Court required the insurer to establish actual prejudice to its position despite the insured's three year delay in providing it with notice of the suit for which it was seeking coverage.

Insurers' reliance on language to the contrary in *West Bay Exploration v. AIG Specialty Agencies*, 915 F.2d 1030, 1037 (6th Cir.1990) is misplaced. *West Bay* quotes language from the Michigan Supreme Court's decision in *Wehner* where it surveyed decisions from other jurisdictions and quoted language from a California decision, *Purefoy v. Pacific Automobile Indemnity Exchange*, 5 Cal.2d 81, 53 P.2d 155 (1935). Despite quoting language from *Purefoy* about presuming prejudice in some late notice situations, the *Wehner* Court did not presume prejudice simply due to the length of delay in that case. Rather, it held that the insurer had presented sufficient evidence to make out a prima facie case of prejudice which the insured failed to rebut. Accordingly, because it was undisputed, the Court concluded that the trial court had erred in submitting the issue of prejudice to the jury.

To establish it was prejudiced by the insured's untimely notice, the insurer in *Wehner* had presented undisputed evidence that the accident giving rise to the lawsuit was not reported to the insurer until after the suit was filed; the insurer had no opportunity to inspect the damaged automobile or to investigate the accident prior to the suit being filed; and that had timely notice been provided, the insurer would have followed its usual procedure of inspecting the automobile, interviewing witnesses, investigating questions of liability and damages and, if feasible, pursuing the possibility of settlement. The insured did not provide evidence that controverted the insurer's prejudice evidence, and thus the Michigan Supreme Court held that the issue of prejudice was not in dispute and should not have gone to the jury.

To the extent *CPC Int'l, Inc. v. Aerojet–General Corp.*, 825 F.Supp. 795, 814–15 (W.D.Mich.1993) reaches a different conclusion, this Court believes that the holding in that case regarding the ability to presume prejudice under Michigan law is incorrect. Careful examination of the *West Bay* and *Wehner* decisions, and the more recent *Koski*

decision by the Michigan Supreme Court, does not support the position that prejudice may be presumed simply by considering the length of the delay in providing notice. Under Michigan law, the delay in providing notice is one factor to be considered when determining whether the insurer has established actual prejudice to its position. *See Upjohn Co. v. Aetna Casualty and Surety Co.*, 768 F.Supp. 1186, 1203, n. 21 (W.D.Mich. 1990) (where the court observed that "[e]ven excessive delay will not preclude coverage unless the insurer can demonstrate actual prejudice.").

Courts in other jurisdictions have observed that adopting a presumption of prejudice simply due to the length of a delay in notice "would, in effect, constitute a retreat to a mode of interpretation of insurance policies which invites technical forfeitures, and would conflict sharply with the view, previously expressed [by the state court and legislature], that forfeitures should only occur upon a showing of actual prejudice to an insurer's interests." *Hoechst*, 684 N.E.2d at 609 (internal quotes and citations omitted). Michigan law, which requires that the insurer establish actual prejudice to its position, comports with "[t]he rule that is emerging in a majority of jurisdictions;" i.e., "that late notice does not relieve the insurer of its duties under the policy unless the insurer is prejudiced as a result of the delay in receiving notice." Ostrager & Newman, Handbook on Insurance Coverage Disputes, § 4.02[c][2] (8th ed.1995). In sum, "[t]he function of a notice requirement is to protect the insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation." *Hoechst*, 684 N.E.2d at 607 (internal quotes and citations omitted). This is true whether the policyholder is sophisticated or unsophisticated.

**(2) The Michigan Supreme Court Would Not Distinguish Between Sophisticated and Unsophisticated Policyholders**

Insurers have not persuaded this Court that there is a principled reason for the Michigan Supreme Court to distinguish between sophisticated and unsophisticated policyholders thus justifying waiver of the prejudice requirement for sophisticated policyholders. As one court accurately observed, insurance companies are also sophisticated parties. Therefore, adopting the rule Insurers advance merely states a preference between two sophisticated parties; it does not state a rationale for that preference. *See Federated Mut. Ins. Co. v. State Farm Mut. Aut. Ins. Co.*, 282 Ill.App.3d 716, 725, 218 Ill.Dec. 143, 668 N.E.2d 627, 632–33 (1996).

**(3) Prejudice Defined**

In *West Bay*, the court observed that "[p]rejudice will be found where the delay 'materially' impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party." 915 F.2d at 1036–37. It clarified that "Michigan law does *not* require an insurer to prove that but for the delay *it would have avoided liability.*" *Id.* at 1037 (emphasis added). It further observed that "[w]hile the question of prejudice is generally to be left to the trier of fact, where the facts are so clear that one conclusion only is reasonably possible, the question is one of law." *Id.* (internal quotes and citation omitted).

Dow claims that Insurers cannot establish actual prejudice to their position by simply asserting that Dow's delay in providing notice created lost opportunities. This Court agrees. An insurer's bald assertion that witnesses have died, documents have been lost or destroyed, or opportunities have been lost is insufficient to show actual prejudice to its position as required under *Koski*. If the function of the prejudice requirement is to protect the insurer's interests from being prejudiced, then the insurer must come forward with proof that its interests were actually prejudiced; not speculation that its interests were "possibly" prejudiced. *See Hoechst*, 684 N.E.2d at 607, 609. Accordingly, the insurer must identify "the precise manner in which its interests have suffered."

*Id.* at 608. *See also Canron Inc. v. Federal Ins. Co.*, 82 Wash.App. 480, 918 P.2d 937, 943 (1996) (where the court observed that an insurer's "lost opportunity" argument "would obviate the need to show actual prejudice" and therefore is contrary to state law which requires such proof).

In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured. *See Upjohn*, 768 F.Supp. at 1205; *West Bay*, 915 F.2d at 1036–37. "Courts have also considered whether the insurer, after receiving late notice, acted promptly to protect its interests and those of its insured." *Upjohn*, 768 F.Supp. at 1205 (citing *Burgess*, 107 Mich. App. at 629–30, 310 N.W.2d 23; *Bibb*, 44 Mich.App. at 446, 205 N.W.2d 495). Michigan courts have also observed that prejudice cannot be established "if the insurance company received adequate and timely information of the accident or the institution of an action for the recovery of damages ..., regardless of the source of its information." *Koski*, 572 N.W.2d at 639 (quoting *Weller*, 330 Mich. at 293, 47 N.W.2d 612).

An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded. It must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate. *See Kennedy v. Dashner*, 319 Mich. 491, 494, 30 N.W.2d 46 (1947) (where the Court rejected the insurer's argument that its rights were prejudiced by a lost opportunity to investigate a claim and to adequately prepare a defense when the plaintiff's attorney had notified the defendant's insurer about an accident shortly after it had occurred and "an inquiry at the local police department would have disclosed considera-

ble information with respect to the claim"); *Christopher v. Hartford Ins. Group, Inc.*, 1992 U.S. Dist. LEXIS 21640, *6–7 (E.D.Mich. July 1, 1992) (where the court, applying Michigan law, rejected the insurers' arguments that the insured's pre-notice litigation efforts and the state's substantial pre-notice clean-up efforts at the site prejudiced their ability to investigate liability and damage issues because the insurers had not offered any specifics as to how any litigation decisions had prejudiced them and, furthermore, had not "shown that the delay in notice caused a loss of investigatory/documentary evidence relating to the condition of the facility at the time of clean-up, or that any loss of such evidence has made it impossible for them to make an adequate investigation as to the facility and its hazardous waste problems."). *See also United Technologies Corp. v. American Home Assur. Co.*, 989 F.Supp. 128, 141 (D.Conn.1997) (where the court observed that "[f]or purposes of summary judgment, it is not sufficient for [the insurer] to merely state it was prejudiced without specifically identifying how it was prejudiced and articulating with greater precision why [the insured's] documentation is insufficient to cure such prejudice"); *Hoechst*, 684 N.E.2d at 608; *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.*, 89 F.3d 976, 996 (3rd Cir.1996), *cert. denied sub. nom., Jackson v. Chemical Leaman Tank Lines, Inc.*, —— U.S. ——, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). As one court recently observed:

> Delayed notice which interferes with an insurer's ability to evaluate or investigate, as to coverage defenses or as to liability, may indeed cause actual prejudice. Lost witnesses or documents, or changes to the physical site, may affect the ability to investigate. However, prejudice will not ordinarily be presumed; what is lost or changed must be material, and not otherwise available or subject to reasonable reconstruction. Claims of prejudice require affirmative proof.... It is not sufficient merely to allege prejudice; an insurer must demonstrate specifics.

*Canron*, 918 P.2d at 943.

■ Insurers must also establish that the missing evidence was lost between the time the insured should have provided notice and the time it gave notice. Evidence lost before the insured's duty to provide notice arises cannot be used to establish prejudice to the insurer's position because, under those circumstances, both parties are equally disadvantaged by the missing evidence. *See Chemical Leaman*, 89 F.3d at 996 (where the court observed that "[b]ecause 1984 was the earliest practicable date by which Chemical Leaman could have given notice to the [insurer], the [insurer's] assertions that potential valuable evidence was lost prior to 1984 are irrelevant.").

Moreover, an insurer's claims of prejudice regarding a lost opportunity to evaluate, negotiate, defend, or settle a claim or suit must be supported by more than the insurer's bald assertion that the opportunity to do so has been lost. The insurer must present evidence which establishes that its position was actually prejudiced because the insured's delay materially impaired its ability to perform these functions. The same is true for an insurer's claims of prejudice because of a lost opportunity to participate in remediation efforts. When evaluating claims of prejudice based on a lost opportunity, Michigan courts take into consideration whether the insurer, after receiving late notice, acted promptly to protect the interests it claims impaired by the insured's late notice. *See Burgess*, 107 Mich.App. at 629–30, 310 N.W.2d at 25 (where the court observed that "[t]o have been deprived of an opportunity to defend, ..., may or may not have prejudiced the rights of the insurance carrier.... such prejudice does not become material where the carrier, upon notice, does not act or properly act to protect its interest and/or that of its insured. Such prejudice was not attributable, in its ultimate sense, to the insured's failure to give notice of suit, but rather to the insurance carrier's failure to act upon receiving notice"); *Bibb*, 44 Mich.App. at 446, 205 N.W.2d at 498. Courts in other jurisdictions likewise recognize this principle. *See Hoechst*, 684 N.E.2d at 608 (where the court observed that "[w]e do not accept as a generalization that an insured's assumption of liabilities before (delayed) notice is in itself conclusive that the insurer has suffered prejudice.... The issue of prejudice by reason of these agreements is one of fact (like that of notice), and the insurers, having chosen not

to investigate even after notice, have not come near any demonstration that the agreements were other than sound in a business sense"). *See also Maine Drilling & Blasting v. Ins. Co. of N. Amer.*, 34 F.3d 1, 5 (1st Cir.1994); *Canron, Inc.*, 918 P.2d at 943 (where the court held "[t]o establish actual prejudice resulting from delayed notice, an insurer must adduce affirmative proof of an advantage lost or disadvantage suffered as a result of the delay, which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability").

With these principles in mind, the Court now addresses whether Insurers have established, as a matter of law, that: (1) Dow's notice of an occurrence,[6] claim or suit was untimely; and (2) Dow's delay in providing notice actually prejudiced the Insurers' position as to the underlying claim or suit at issue at a Final Site.

### 4. Application of Standard—Site by Site/ Insurer

#### a. Brookhurst and Monahans Final Sites

The only remaining Primary Insurer on the risk at the Brookhurst final site is Fireman's Fund, and it does not address this site in its motion for summary judgment based on late notice. The Monahans, Texas final site is no longer at issue in this litigation. *See* 4/10/98 Mem. Op.

#### b. Harris/Farley Street Final Site

██ The Harris/Farley Street disposal site, which comprises approximately two acres of land, was operated by Davis Enterprises. Dow never owned or operated this site but allegedly shipped styrene tars to the site for a few months in 1958. The only claim and Insurer at issue at this site involve a September 3, 1982 Environmental Protection Agency ("EPA") PRP letter to Dow and Fireman's Fund's 11/19/56—7/30/70 primary policies.

Dow received the PRP letter in 1982, entered into an initial consent order with the EPA in 1983, entered into a second consent order in 1985, and completed remediation at this site on July 29, 1986. *See* Dow time line; FF Notice Br, Exs. 33, 39, 41. Dow should have notified Fireman's Fund within a reasonable time after receipt of this 1982 PRP letter but did not do so. Dow did not notify Fireman's Fund of this 1982 suit until it filed its November 24, 1993 counter-claim in this action. Accordingly, Fireman's Fund has met its burden by establishing, as a matter of law that Dow's notice was untimely.

██ This Court further finds that Fireman's Fund has met its burden by establishing, as a matter of law, that Dow's delay in providing notice actually prejudiced it by materially impairing Fireman's Fund's ability to pursue contribution actions against other responsible parties at this site. Dow does not

---

6. Occurrence is defined as follows. Travelers' 3/28/50–3/28/53 policies provide that:

> The word "occurrence" means an accident or a single or continuous or repeated exposure to conditions, which results in injury during the policy period. All damages arising out of such exposure to substantially the same general conditions existing at or emanating from any one premises location shall be considered arising out of one occurrence. The policy does not apply to bodily injury, sickness, disease or death or injury to or destruction of property caused with intent to do harm by or at the direction of an executive officer or director of the insured.

*See* Dow Duty to Defend Br., Ex. 1. Travelers' 3/28/53–3/28/54 and 6/1/54–11/19/56 policies provide that:

> "Occurrence" means either an accident or a continuous or repeated exposure to conditions which result during the policy period in injury to persons or real or tangible property which is accidentally caused. All damages arising out

of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.*

Fireman's Fund's 11/19/56–6/1/57, 6/1/57–6/1/60, 6/1/60–1/1/64, and 1/1/64–7/30/70 policies provide that: "The word 'occurrence' as used in this policy, shall include a single occurrence or a single accident, or a series of them arising out of one event or disaster." *Id.* Fireman's Fund's 7/30/70–1/1/74 and 1/1/74–4/1/76 policies provide that: " 'occurrence' means an event, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage not intended from the standpoint of the insured". *Id.*

Aetna's 4/1/76–4/1/85 policies provide that: " 'occurrence' means an accident, including continuous or repeated exposure to conditions, which results in personal injury, advertising offense or property damage, which is neither expected nor intended from the standpoint of the insured." *Id.*

dispute that there were other PRP's at this site from whom it could have sought contribution and admits that it tried unsuccessfully to convince at least one PRP to participate in site remediation activities. *See* Dow Br. at 61, Dow Exs. 166, 153 at 187–89. It is also undisputed that Dow never enforced any contribution rights against any other PRP at this site. Dow asserts that it decided not to pursue contribution actions, despite the possibility of recovery, because it believed that recovery, if any, would not justify the expense of litigation. *See* Dow. Br. at 61, Dow Ex. 153 at 415–16. This explanation, however, is insufficient to defeat Fireman's Fund's evidence that Dow's delayed notice of the 1983 EPA PRP letter and its pre-notice conduct prejudiced Fireman's Fund's ability to seek contribution from other PRP's at this site. Dow was not entitled to unilaterally dispose of Fireman's Fund's claims against third parties. Accordingly, Fireman's Fund is entitled to summary judgment as to this site.

### c. Hartley & Hartley Final Site

■ The Hartley & Hartley site consists of a landfill owned and operated by Hartley & Hartley from 1955 to 1978. Dow never owned or operated the facility but sent wastes to it for disposal from 1958 to 1978. At issue here are Fireman's Fund's primary policies for the period from 11/19/56 through April 1, 1976 and Aetna's primary policies for the period covering April 1, 1976 through April 1, 1985. Also at issue are the following three claims: (1) a March 1, 1994 Michigan Department of Natural Resources ("MDNR") PRP letter to Dow; (2) a June 28, 1994 MDNR lawsuit against Dow; and (3) a June 30, 1994 private lawsuit brought by Waste Management against Dow.

Dow notified Fireman's Fund and Aetna of the first claim on March 16, 1994, the second claim on August 3, 1994, and the third claim of September 12, 1994. The first two claims settled in January 1995, and the third claim settled on May 30, 1997. Fireman's Fund and Aetna do not allege that notice of these claims was untimely or that they were prejudiced by any delayed notice of these claims. Rather, Insurers claim Dow had knowledge of, and thus should have provided notice of, an "occurrence" in 1969; twenty-five years before any governmental or private action involving environmental clean-up at the site was asserted against Dow. Insurers argue that they have established, as a matter of law, that Dow's delayed notice of this alleged "occurrence" caused them to suffer actual prejudice thus entitling them to summary judgment. This Court disagrees.

Insurers' assert that Dow had notice of an occurrence at the Hartley & Hartley site at least by 1969 when Arlow Boyce, a MDNR employee, allegedly advised the Dow Board of Directors that its wastes were being burned rather than land filled by Hartley & Hartley, thus contaminating that site and the adjoining Tobico Marsh. Insurers further claim that, by 1970, Dow had water samples showing increased chloride levels in the groundwater at this site and chlorides were one of the sources of groundwater contamination at this site identified by the MDNR as requiring remediation. As this Court previously recognized in its 4/10/98 Mem. Op. at 40–41, Dow has presented evidence which disputes Arlow Boyce's testimony and supports its claim that the increased chloride levels in the water samples from the Tobico Marsh area were not serious, were attributed to the disposal of bine products originating from an oil field service company and not Dow, and were unrelated to the groundwater contamination at issue in the three 1994 claims regarding this site. Moreover, as Dow points out, in 1969 and 1970 when these events allegedly occurred, there were no strict liability environment laws making Dow liable for cleaning-up contamination caused by a licensed landfill facility which it never owned or operated. Accordingly, this Court finds that Insurers have not established, as a matter of law, that Dow's insurance or legal department had notice of an occurrence in 1969 or 1970 and that Dow failed to timely notify Insurers of that occurrence; thus, there is no need to address the Insurers' arguments that Dow's delayed notice of a 1969–1970 occurrence caused them to suffer actual prejudice as to the three 1994 claims at issue here.

### d. Midland, Texas Final Site

The Midland, Texas site was operated by Dow's Dowell Division from 1952 to 1984, and

from 1984 to 1993 by Dowell Schlumberger, Inc. ("DSI"), a joint venture created by Dow and Schlumberger in 1984. The Dowell Division used the facility as a base for oil and gas well enhancement services which were performed at its customer's sites. Materials used in its operations, including hydrochloric acid, sand, cement and gasoline for the facility's trucks, were stored in above-ground and underground storage tanks at the site. The site also had acid mixing facilities, an open-topped underground concrete tank, truck washes, maintenance shops, and a laboratory. The "acid plant" had a concrete loading pad, two sumps, a 500 gallon buried steel tank, an underground pipeline that was used to send acid plant wastewater to the underground concrete tank. The underground concrete tank operated from approximately 1955 to 1983.

■ There is one claim at issue at this Midland, Texas site, the *Charles White* 1991 lawsuit. Also at issue are Travelers' (1954—11/19/56 policy period) and Fireman's Fund's (11/19/56—7/30/70 policy period) primary policies. As to the *Charles White* suit, Dow received a demand letter on September 5, 1991, and the complaint was filed on November 26, 1991. Dow provided Insurers with notice of the demand letter on September 25, 1991 and notice of the complaint on December 13, 1991. The lawsuit settled on December 1, 1995.

Insurers contend that by 1985 Dow was aware of "oil contamination down to the water table" at the Midland site and that by 1989 Dow was aware of the off-site groundwater contamination at issue at this site and failed to provide Fireman's Fund and Travelers with timely notice of these "occurrences." This Court concludes that Insurers have established, as a matter of law, that by 1989 Dow was aware of the off-site contamination at issue in the *White* litigation and failed to timely notify Insurers of this "occurrence."

Insurers present evidence that in 1989, as a result of DSI's self-initiated environmental assessment program at the Midland site, "four underground fuel storage tanks and two underground truck wash bay separators were excavated and removed." Trav. Notice Ex. 110. Subsequent investigations required by the State of Texas Water Commission ("TWC") revealed chlorinated organic com-

pounds in the groundwater in the vicinity of DSI's Midland facility, and Mr. White, the owner of adjacent property, BJ Electric Meter Service, was informed at a December 18, 1989 meeting that samples from his well "indicated the presence of some organic constituents ... at levels above federally established drinking limits." *Id.* at 2. Mr. White requested that DSI provide water to his BJ Electric Meter Service site, and DSI obliged Mr. White's request. *Id. See also* Trav. Notice Ex. 114.

Fireman's Fund and Travelers argue that they have established, as a matter of law, that Dow's delayed notice of the 1989 "occurrence" prejudiced them by materially impairing their ability: (1) to investigate liability and damage issues after the removal and destruction of underground storage tanks and other physical evidence from the site, memories have faded, witnesses have died, and documents have been lost or destroyed; (2) to participate in investigations, negotiations, and the settlement of the Texas Water Commission claims against DSI; and (3) to pursue claims against third parties in light of Dow's 1984, 1988 and 1992 cost-sharing agreements with DSI. This Court disagrees.

■ First, Insurers' prejudice arguments that relate solely to the State of Texas claim against DSI are no longer relevant because that claim has been dismissed from this action. *See* 4/10/98 Mem. Op. at 56. Second, Insurers' non-specific claims that witness have died, memories have faded and documents have been lost or destroyed are insufficient to establish prejudice. *See United Technologies,* 989 F.Supp. at 141; *Hoechst,* 684 N.E.2d at 608; *Chemical Leaman,* 89 F.3d at 996; *Canron,* 918 P.2d at 943. Travelers and Fireman's Fund's have not identified specific witnesses or documents that became unavailable after the time Dow should have but did not provide notice and have not otherwise established how any allegedly lost evidence is relevant to any issues in the *White* litigation. *Chemical Leaman,* 89 F.3d at 996. The Court is not persuaded by Fireman's Fund's straw man prejudice argument that Dow's late notice somehow precluded it from producing documents on Dowell's sale of surface impoundment liners. FF Br. at 27. As Dow points out, it has repeatedly informed Insurers that its investigation has

not uncovered evidence that Dow or Dowell ever sold liners, numerous witnesses have testified to this fact, and Dow has already produced documents regarding its use of temporary liners manufactured by others and used by Dow at sites other than Midland. Dow Notice Br, Ex. 148.

██ Insurers also claim prejudice from physical alteration of the Midland site. Insurers cannot establish prejudice, as a matter of law, by referencing alterations made to the site after Dow's notice in 1991; i.e., excavation of the surface impoundment in October, 1992 and backfill of that area in March, 1993; removal of northern septic tank in Fall, 1992 and backfill of that area in 1993; decommission and dismantling of acid plant during the summer of 1993; and removal, excavation and backfill of remainder of the acid plant in late 1993 and early 1994. *See Upjohn,* 768 F.Supp. at 1205; *Burgess,* 107 Mich.App. at 629–30, 310 N.W.2d 23; *Bibb,* 44 Mich.App. at 446, 205 N.W.2d 495. Insurers' failure to independently investigate after notice casts doubt on the credibility of their "lost opportunity" arguments.

██ Insurers' remaining prejudice arguments are likewise unpersuasive. Insurers' make much of the excavation and destruction of five underground storage tanks in 1989 and the backfill of the area in 1990. Despite the availability of detailed contemporaneous reports prepared for Dow regarding the removal of the storage tanks and related activity, Travelers and Fireman's Fund assert that Dow's removal and destruction of these storage tanks materially impaired their ability to prove that property damage from the discharge of pollutants from those tanks was not sudden and accidental thus precluding indemnification under their policies. Insurers rely on *West Bay,* 915 F.2d 1030, 1037 and an unpublished Sixth Circuit decision, *Steelcase, Inc. v. American Motorists Ins. Co.,* 907 F.2d 151, 1990 WL 92636, *2 (6th Cir. July 3, 1990), to support their prejudice argument. Their reliance is misplaced.

The prejudice holding in both *West Bay* and *Steelcase* hinges upon an assumption that the insurer has the burden of proving the pollution exclusion applies because discharges were not sudden and accidental.[7] That assumption is in error. In a more recent decision, the Sixth Circuit has clarified that the insured has the burden of proving that the exception to the pollution exclusion applies. *See Harrow Products, Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1020 (6th Cir.1995) (where the court observed that "it would be strange" to force the insurer "to prove a negative" especially when the insured "is the party most likely to have the relevant information about its operations."). As the *Harrow* court recognized, it is the insured, not the insurer, who must prove that discharges were sudden and accidental and that indemnification coverage is available. Accordingly, the rationale and holding in *West Bay* and *Steelcase* is seriously undermined.

Likewise undermined is the *Steelcase* court's conclusion that a contemporaneous investigation of the excavation and destruction of storage tanks by an independent agent is "a poor substitute" for an insurer's own investigation and is "insufficient to protect [insurers] from prejudice in their defense against [the insured]'s claim."[8] *Steelcase,* 1990 WL 92636 at *3.[9] Prior analysis of

---

7. In *West Bay* and *Steelcase,* the Sixth Circuit held that the insurers had established they were prejudiced because the insured's destruction of physical objects that allegedly discharged pollutants "materially compromised the [insurers'] ability to present their most powerful defense to liability under the policy" by proving discharges were not sudden and accidental. *West Bay,* 915 F.2d at 1037.

8. In its unpublished *Steelcase* decision, the Sixth Circuit concluded that a contemporaneous investigation of excavation and destruction of storage tanks that were allegedly discharging contaminants prepared by an independent agent was "a poor substitute" because insurers "could not be certain that the independent tester investigated with the same motivations and the same attention to possibly exculpatory details" that would allow the insurers to successfully prove that the discharges were not sudden and accidental. 1990 WL 92636 at *3.

9. This Court further observes that, as an unpublished decision, the *Steelcase* decision is not binding on this Court, and it declines to follow its overly broad conclusion that contemporaneous investigations by independent agents are necessarily "insufficient" to protect insurers from prejudice in their defense of claims against their insured.

the Midland site in connection with the pollution exclusion defense has already established that an insurer is not necessarily prejudiced when an independent investigator, rather than the insurer, conducts a contemporaneous investigation of the excavation and destruction of storage tanks and prepares a contemporaneous written report of its findings. At the Midland site, for example, Dow identified the 1989 discovery of holes in the underground storage tanks at issue·here as evidence of a sudden and accidental polluting event. This Court examined the written report of the tanks' removal, which was prepared for Dow, and found that it refuted rather than supported Dow's position; the Court granted Travelers' motion for summary judgment based on its pollution exclusion as to the Midland site. *See* 4/10/98 Mem. Op. at 29–30. Thus, Travelers' ability to avoid indemnification based on its pollution exclusion was not prejudiced by its "lost opportunity" to conduct its own contemporaneous investigation. ·

■ This Court also rejects Fireman's Fund's argument that it has established prejudice, as a matter of law, simply because the report regarding the removal of the Midland underground storage tanks in 1989 does not contain information as to when releases and contamination occurred. Fireman's Fund has not established whether and why this information cannot be obtained from other sources. *See Christopher,* 1992 U.S. Dist. LEXIS 21640 at *6–7; *United Technologies,* 989 F.Supp. at 141; *Hoechst,* 684 N.E.2d at 608 (where the court observed that "insurers are far from demonstrating material prejudice as [a] matter of law arising from lost evidence" when "recreation of what occurred at the site was reasonably feasible"); *Canron,* 918 P.2d at 943 (where the court observed that, to establish prejudice, the insurer must show that "what is lost or changed" is "material, and not otherwise available or subject to reasonable reconstruction. . . . It is not sufficient merely to allege prejudice; an insurer must demonstrate specifics."). In the context of environmental insurance disputes where actual property "damage is not discovered until years after the pollution be-

gan," the insured and insurer often use experts on hydrogeology and contaminant transport to determine how quickly discharged pollutants would have traveled through the soil and how and when soil and groundwater contamination would have occurred. *Gelman Sciences, Inc. v. Fidelity & Casualty Co.,* 456 Mich. 305, 312, 329, 572 N.W.2d 617, 620, 628 (1998). The availability of this type of evidence casts doubt on Fireman's Fund's claim that Dow's removal of the tanks precludes Fireman's Fund's ability to investigate the timing of releases and contamination. In sum, Insurers have not established prejudice as a matter of law with regard to the one remaining claim at the Midland site. ·

### e. Silresim Final Site

■ The Silresim site is located in Lowell, Massachusetts and was owned and operated by Silresim Corporation from 1971 to 1977 as a chemical reprocessing and waste recycling facility. The site was never owned or operated by Dow, but Dow sent its wastes there from approximately 1974 through 1977. There are four remaining claims at this site and one primary insurer—Aetna (4/1/76—4/1/85 primary policy period). The claims are: (1) August 22, 1983 PRP letter from the Commonwealth of Massachusetts; (2) December 9, 1983 lawsuit filed by the Commonwealth of Massachusetts; (3) August 22, 1983 PRP letter from the EPA; and (4) a May 8, 1989 demand letter to Dow from the EPA. The Massachusetts claims were settled in March of 1984, and the EPA claims were settled by virtue of an April 27, 1993 consent decree.

Dow notified Aetna about these claims on November 24, 1993 when it filed its counterclaim in this action.[10] Recently produced evidence, however, also reveals that Aetna was aware in 1985 of the 1983 EPA suit against Dow. *See* Dow's 4/9/98 Supp. Mem., Exs. B and C. Aetna claims that Dow's notice was untimely as·a matter of law, and Dow's delayed notice prejudiced it, as a matter of law, because it deprived Aetna of the oppor-

---

**10.** Dow provided notice of the 1983 Commonwealth of Massachusetts PRP letter and complaint to Fireman's Fund in February 1984.

Fireman's Fund, however, is no longer on the risk at this site. *See* 4/10/98 Mem. Op. at 16.

tunity: (1) to participate in remedial planning, investigations, and clean-up which took place pre-notice; (2) to investigate the alleged causes of contamination as a result of extensive pre-notice removal activities at the site and the deaths of key witnesses; and (3) to participate in the defense and settlement of the Massachusetts and EPA claims as a result of Dow's pre-notice settlement.

This Court agrees with Aetna that Dow's notice of the Massachusetts and EPA claims was untimely. It does not agree, however, that Aetna has established, as a matter of law, that it has suffered actual prejudice as a result of Dow's untimely notice. Michigan courts have observed that prejudice cannot be established "if the insurance company received adequate and timely information" of an occurrence, claim or suit "regardless of the source of its information." *Koski*, 572 N.W.2d at 639 (quoting *Weller*, 330 Mich. at 293, 47 N.W.2d 612). When determining prejudice, Michigan courts also consider "whether the insurer, after receiving late notice, acted promptly to protect its interests and those of its insured." *Upjohn*, 768 F.Supp. at 1205 (citing *Burgess*, 107 Mich. App. at 629–30, 310 N.W.2d 23; *Bibb*, 44 Mich.App. at 446, 205 N.W.2d 495). Aetna's "lost opportunity" arguments are undermined by Dow's evidence that, despite notice in 1985 of the EPA's environmental claims, it did not seek to participate in those actions or conduct any independent investigation so as to protect both its and its insured's interests. Aetna has not specified: (1) whether and how Dow's pre-notice conduct as to the Massachusetts claims, as opposed to the EPA claims, have prejudiced it; (2) how Dow's conduct prior to Aetna's 1985 notice of the EPA claims prejudiced it; and (3) whether and why its notice in 1985 of the EPA claims was inadequate to allow it to protect both its interests and Dow's interests. Finally, this Court agrees with Dow, that Insurers cannot establish prejudice by pointing to the remedial activities that took place at the Silresim site five years before Dow received the PRP letters issued by both the EPA and the Com-

monwealth of Massachusetts. *See* Dow Notice Br., Ex. 183, 184 and 185.

### f. Daffron and Pinion Final Site

Dow has operated a latex manufacturing plant at Dalton, Georgia since 1966. In 1966, it installed three latex coagulation ponds as part of its wastewater treatment system. A fourth pond was installed in 1970. Dow closed the ponds between 1983 and 1986. Dow claims that these latex coagulation ponds and the landfill at its Dalton facility were the sources of on and off-site groundwater contamination. *See* FF Notice Br., Ex. 30.

■ Fireman's Fund (11/19/56—7/30/70) is the only Primary Insurer remaining at risk at this site, and there are two claims at issue: (1) a April—May, 1987 State of Georgia notice to Dow; and (2) a private lawsuit filed on October 19, 1988 by Mr. and Mrs. Jesse Pinion and Maurice and Shirley Daffron. Dow Notice Br., Ex. 11. Dow contends that Fireman's Fund had notice of the State claim by May 1, 1989 at the latest and had notice of the *Daffron and Pinion* lawsuit by March 28, 1989. Dow further contends that the State of Georgia action is ongoing pursuant to a August 19, 1988 corrective action order, and the *Daffron and Pinion* lawsuit was resolved on November 28, 1991.

Fireman's Fund argues that Dow knew of an occurrence at the Daffron and Pinion site no later than April or May 1987 but failed to provide it with timely notice.[11] In support, Fireman's Fund presents evidence that Dow knew of an occurrence by that date because: (1) the Georgia Environmental Protection Division ("EPD") had tested samples from a small stream, located near Dow's Dalton, Georgia plant and on the Daffron and Pinion properties, and had found trace levels of two compounds used in the Dow Dalton plant process in the water samples; (2) the Georgia EPD requested that Dow investigate whether there was groundwater contamination; and (3) Dow knew that neighboring property owners, the Daffrons and Pinions,

---

**11.** Fireman's Fund's policies in effect from 1964–1976 require notice of an occurrence as soon as practicable "after such occurrence ... *has been reported to [Dow]'s insurance or legal*

*department." See* FF Notice Br., Ex. 1 (emphasis added). Fireman's Fund's earlier policies require notice of an occurrence as soon as practicable after it occurs.

were concerned that chemicals from Dow's Dalton plant had contaminated their groundwater. *See* FF Notice Br., Ex. 119, 124, 77. Fireman's Fund argues that this constitutes knowledge of an "occurrence" and Dow should have but failed to provide any notice of this "occurrence" until March of 1989 when it tendered the *Daffron and Pinion* suit to Fireman's Fund.

Fireman's Fund also contends that Dow knew about the 1987 State of Georgia claim by April 1987 at the latest because, by that time, Dow had: (1) received the results of water sampling which revealed trace levels of contaminants in the water at the site; and (2) had retained a remediation expert to determine the source and extent of groundwater contamination on and around the Dalton facility.

Finally, as to the 1988 *Daffron and Pinion* lawsuit, Fireman's Fund contends that Dow's March 28, 1989 notice of the *Daffron and Pinion* lawsuit, filed on October 19, 1988, was untimely because Dow had notice of the underlying claim by May 1987 at the latest. Fireman's Fund presents evidence that Dow became aware of the claim in May 1987 when the Pinions' lawyers met with Dow's Dalton plant manager and Dow's in-house counsel and demanded $5,000,000 to settle the claim. *See* FF Notice Br., Ex. 133, Ex. 124 at 329, 334–35.

In light of the above, this Court determines that Dow should have provided notice to Fireman's Fund of these occurrences/claims at least by May of 1987. Its failure to do so renders its notice untimely. To avoid its indemnification duties, however, Fireman's Fund must also establish that it was actually prejudiced by Dow's untimely notice.

▪ As to the State of Georgia claim, Fireman's Fund asserts that it was prejudiced because Dow failed to notify it about this claim until it was identified in Dow's September 1996 discovery responses. Dow's delayed notice, Fireman's Fund argues, precluded it from taking part in remediation negotiations with the State which resulted in an August 1988 Corrective Action Order requiring Dow to "implement corrective measures as soon as possible to prevent further migration of contaminated groundwater."

*See* FF Notice Br., Ex. 129 at 2. Dow responds that Fireman's Fund was aware of the State of Georgia claim as early as May 1, 1989 and was aware of the remediation activities while they were ongoing, that it made no effort to get involved, and, therefore, it cannot rely on that post-notice remediation activity and claim that it has established prejudice as a matter of law. This Court agrees.

Dow presents evidence that Fireman's Fund had notice of this State of Georgia claim as early as May 1, 1989. Fireman's Fund's internal documents reveal that it knew that: (1) the State had tested the water and found low levels of certain chemicals; (2) Dow had "hired a hydrogeological firm to do preliminary tests", the firm had "found a portion of sub-surface groundwater contamination", and had recommended a remedial action plan which Dow was attempting to get approved; and (3) Dow had spent $600,000 on remedial investigation and had estimated $400,000 as the cost of remedial action. Dow Notice Br., Exs. 69, 70. In August of 1989, Dow also provided Fireman's Fund with a copy of the deposition of its hydrogeologist expert, Thomas Kwader, and this contained extensive testimony about the remedial investigation and activity at this site. Dow Notice Br., Ex. 72, 71. Fireman's Fund has not provided the Court with evidence that the 1988 Corrective Action Order was not open to modification thus precluding Fireman's Fund from participating in remedial investigation and activity decisions. Similar to the insurers in *Christropher v. Hartford Ins.*, Fireman's Fund has not "shown that the delay in notice caused a loss of investigatory/documentary evidence relating to the condition of the facility at the time of the cleanup, or that any loss of such evidence has made it impossible for them to make an adequate investigation as to the facility and its hazardous wastes problems." 1992 U.S. Dist. LEXIS 21640 at *6. This Court observes, as did the court in *Christopher*, that Fireman's Fund's arguments "ask this Court to presume prejudice from the fact that some clean-up of the facility has taken place." *Id.* Michigan law does not support Fireman's Fund's argument that this Court should presume prejudice; further, this Court concludes that Fireman's Fund has not estab-

lished, as a matter of law, that it suffered actual prejudice to its position as a result of Dow's untimely notice of the State of Georgia claim.

This Court also concludes that Fireman's Fund has not established that Dow's untimely notice of the claims giving rise to the *Daffron and Pinion* lawsuit prejudiced it as a matter of law. Its unsupported assertion that pre-notice discovery has prejudiced it is unpersuasive. So, too, is Fireman's Fund's contention that it was deprived of the opportunity to shore up Dow's statute of limitations defense, despite Mrs. Daffron's admission that the Daffrons and Pinions knew as of the early 1970's that Dow's operations were damaging their property, because Dow stipulated that Mrs. Daffron's deposition testimony would serve as the testimony of her parents, the Pinions.

Moreover, Fireman's Fund cannot claim prejudice as a matter of law from Dow's counsel's failure to timely file a notice of appeal in 1990 when they had notice and an opportunity to participate in all litigation decisions since 1989. Also, despite claims of prejudice because critical witnesses have died or lost their memories and critical documents have been lost or destroyed, Fireman's Fund has not established that this evidence: (1) became unavailable after the time Dow should have provided notice; (2) is not available from another source; (3) existed in the first instance; and (4) is relevant and material to claims at issue here. Likewise, Fireman's Fund cannot establish prejudice simply by asserting that Dow closed and backfilled surface ponds at this site prior to the time it was required to provide notice of any occurrence, claim or suit with regard to this site.

The Court is likewise unpersuaded by Fireman's Fund's claim that it has established prejudice as a matter of law because Dow's delayed notice precluded Fireman's Fund from taking part in some pre-notice settlement discussions, including offers from the plaintiffs' attorneys to recommend to their clients that the case be settled for $500,000 and $1,400,000. FF Notice Br., Exs. 137, 138. Dow responded to these offers with a settlement offer of $160,000. Dow's offer was rejected on September 20, 1988, and suit was filed on October 19, 1988. FF Notice Br., Ex. 142, Ex. 119. There is no evidence that, after receiving notice, Fireman's Fund suggested that Dow should settle the matter rather than proceed to trial, that it questioned Dow's settlement decisions, or that it questioned Dow's decision to try the case on its theory that it was not liable for the alleged losses. This lawsuit was resolved on November 28, 1991, and Fireman's Fund had notice of it since March 18, 1989. Fireman's Fund's inaction after notice undermines its claims of prejudice. *See Upjohn,* 768 F.Supp. at 1205; *Burgess,* 107 Mich.App. at 629–30, 310 N.W.2d 23; *Bibb,* 44 Mich.App. at 446, 205 N.W.2d 495.

### g. Cliffs–Dow Site

From 1935 to 1968, Cliffs–Dow Corp., which was formed in 1935 by Dow and the Cleveland–Cliffs Iron Co., operated a plant on a 77 acre site in Marquette, Michigan. Cliffs–Dow disposed of various wastes, including tars, at this former plant site. FF Notice Br., Ex. 10 at 9. In 1968, Cliffs–Dow transferred the site to the Georgia–Pacific Corp. and E.L. Bruce Co., who operated the facility under the name of Royal Oak Charcoal Co. The property was subsequently sold to C & W Co. (a predecessor to Presque Isle Harbor Development Co.) in 1969. C & W Co. then transferred portions of the property to several related companies, including Bagwan, Inc. *See* FF Notice Br., Exs. 75, 80.

At this site, there remain two claims and numerous Insurers. The claims include: (1) an October 31, 1991 State of Michigan MDNR PRP letter to Dow; and (2) a February 1992 private lawsuit, *Presque Isle,* brought against Dow asserting claims under CERCLA, the Michigan Environmental Response Act, and Michigan common law. The Insurers remaining on the risk include: Travelers (primary policies covering 3/28/50—11/19/56), Fireman's Fund (primary policies covering 11/19/56—7/30/70), Zurich (primary policies covering 3/28/49—3/28/50), Century (primary policies covering 6/1/44—3/28/49) and Certain Defendants (various excess policies). Dow provided notice of the State of Michigan and *Presque Isle* claims to Insurers when it filed its November 24, 1993

counterclaim in this action. It also provided notice of the *Presque Isle* claim to Century, Fireman's Fund, Travelers, and Zurich on December 10, 1993. The State of Michigan claim is ongoing: remedial investigation began in 1987, was completed in 1993, but remediation activities are ongoing. The *Presque Isle* claim was settled on October 10, 1995.

Insurers contend that Dow failed to timely notify them of a 1981 occurrence despite its responsibility to do so. Specifically, Insurers argue that Dow became aware of groundwater contamination in 1981 after two hikers fell into tar pits, at a site other than the Cliffs–Dow plant site at issue here, and the City of Marquette and the MDNR began to investigate for possible contamination of sites in the area. The evidence they rely upon, however, fails to establish their broad claims.

For example, the 1981 internal Dow memo that Insurers rely upon reveals that, although Dow was concerned about claims of contamination at the plant site, it concluded that it had "no reason to believe that this material would meet the RCRA definition of a hazardous waste." FF Notice Br., Ex. 84. Likewise, the 1981 report Insurers rely upon to show Dow had knowledge of "confirmed groundwater contamination at the site," refutes rather than supports that claim. The report concludes that "[n]o purgeable priority pollutants were detected in water collected at the site." FF Notice Br., Ex. 87 at 2, 5. Insurers have not established, as a matter of law, that Dow knew of an occurrence in 1981 and failed to provide notice as required under their insurance policies.

■ Insurers next contend that by 1984 Dow was aware of an occurrence for which it failed to provide timely notice because by then: (1) Dow knew that the Cliffs–Dow former plant site was listed on the Michigan Act 307 list—a list of sites the State of Michigan identifies as possibly requiring remediation and requiring investigation, FF Notice Br., Ex. 52 at 70–71; (2) Dow, Cleveland–Cliffs, and Georgia–Pacific, were voluntarily, in the absence of a state or federal claim of liability against them, "negotiating an agreement to study possible remedial action to remove or contain waste resulting from the manufacture of wood products that may be present at sites in and around Mar-

quette, Michigan," FF Notice Br, Ex. 89; (3) Dow, Cleveland–Cliffs, and Georgia–Pacific had entered into a cost sharing agreement involving remedial investigation and, if necessary, remediation of the Cliffs–Dow former plant site, FF Vol. Pymt. Br., Ex. 142; and (4) in 1984, Dow and these other corporations met with the U.S. EPA and the State to discuss any potential investigation and remediation activities for the various Cliffs–Dow sites, FF Notice Br., Ex. 90, Ex. 81 at 153–56; Zurich Notice Br., Ex. 12. This Court agrees with Insurers. It is not persuaded by Dow's response that it did not believe it would be required to remediate, and thus there was no occurrence, until after the remedial investigation was completed in 1993 and groundwater contamination was confirmed. The evidence Insurers present of Dow's actions in 1984 establishes otherwise.

Dow also failed to timely notify Insurers after it received notice in 1985 that the State of Michigan (MDNR) would require Dow to investigate the Cliffs–Dow former plant site. *See* Trav. Notice Br., Ex. 67 at 3. Dow, in 1985, hired an environmental consulting firm to conduct a remedial investigation of the northern portion of the Cliffs–Dow former plant site. FF Notice Br., Exs. 92, 93. The work plan for a remedial investigation was submitted to Dow in June 1987. Dow's Insurers learned of this 1985 MDNR demand during the course of this litigation.

■ On October 31, 1991, the MDNR issued a PRP letter to Dow regarding the Cliffs–Dow plant site. Insurers, who received notice of this MDNR PRP letter via Dow's November 24, 1993 counterclaim in this lawsuit, argue that notice was untimely. Insurers also argue that Dow's November 24, 1993 and December 10, 1993 notice of the *Presque Isle* February 1992 lawsuit is also untimely. This Court agrees.

In sum, as to the State of Michigan claims, Dow's notice of the 1984 occurrence, the 1985 occurrence/claim, and the 1991 claim/suit was untimely. Dow's notice of the February 1992 *Presque Isle* lawsuit was also untimely. Insurers, however, are not entitled to summary judgment as to this site because they have not persuaded the Court that Dow's untimely

notice of occurrence, claims and suits has prejudiced them as a matter of law.

■ Insurers' non-specific arguments that Dow's delayed notice resulted in the loss of key documentary or testimonial evidence are insufficient to establish prejudice. *See United Technologies*, 989 F.Supp. at 141, *Hoechst*, 684 N.E.2d at 608; *Chemical Leaman*, 89 F.3d at 996; *Canron*, 918 P.2d at 943. Insurers have not shown that this evidence was lost after the time Dow should have provided notice, that it is otherwise unavailable from another source, and have not explained why it is relevant and material. Insurers' bald assertion that the evidence is "key" is not enough. Insurers do not specify what insurance coverage issues are left unexplored in the transcripts of 17 former Cliffs–Dow employees who were deposed in 1993 in the underlying *Presque Isle* litigation. These witnesses provided detailed historical information about operations and waste handling at this site.

This Court is also unwilling to find that Insurers have established prejudice as a matter of law solely on the basis that Dow cannot locate the written demand Mr. Witt discussed in his deposition testimony. The existence of this 1985 MDNR demand letter remains a disputed issue of fact. Dow, however, has the burden of establishing it is entitled to indemnification under Insurers' policies. Thus, Dow's inability to produce the 1985 MDNR demand letter adversely affects its position; not the Insurers' position. If Dow is unable to establish the existence of this claim, there can be no obligation for Insurers to provide indemnification.

■ This Court further finds that Insurers cannot establish prejudice by pointing to site alterations that occurred well before the time Dow should have provided notice of any occurrence, claim or suit; i.e., the destruction and removal of buildings at the site in 1969. Insurers' remaining arguments that they have established prejudice as a matter of law are likewise unpersuasive.

■ Insurers' claims of prejudice due to a lost opportunity to conduct investigations or to participate in negotiations regarding site remediation or settlement with the State of Michigan or the parties involved in the *Presque Isle* litigation are undermined by evidence that, despite notice in 1993 of these claims, Insurers did not seek to participate in those actions and did not conduct any independent investigation so as to protect both its and Dow's interests. *Presque Isle* did not settle until October 1995—nearly two years after Insurers were notified and had the opportunity to participate.[12] Travelers denied coverage for the claim in January 1994. It did not seek to investigate or participate. Dow Notice Br., Ex. 37. There is no evidence that the other Insurers implicated at this site sought to take advantage of the opportunity to participate once notified. *See Upjohn*, 768 F.Supp. at 1205; *Burgess*, 107 Mich.App. at 629–30, 310 N.W.2d 23; *Bibb*, 44 Mich.App. at 446, 205 N.W.2d 495.

■ Dow also presents evidence that Insurers, even when given the opportunity, do not take advantage of the opportunity to investigate Dow's claims and do not find that arrangement objectionable. It presents testimony from Travelers' vice president that he would not be surprised and did not find it "particularly objectionable" that "given the size of Dow and its resources," that Travelers would allow Dow to essentially administer its own claims and essentially run the litigation. Dow Notice Br., Ex. 110 at 146. Dow also produces testimony from a Travelers employee who handled Dow's claims stating that she could not recall any instances where an investigation was requested for a Dow claim. Dow Ex. 115 at 91. Dow also presents testimony supporting its claim that Century's investigations were also cursory; i.e., consisting of requesting information from the insured, from environmental agency personnel, or making Freedom of Information requests. Dow Notice Br., Ex. 116 at 77–78, 152, 257.

As to Fireman's Fund's investigation of Dow claims, Dow presents testimony from employees responsible for handling Dow's claims stating that Fireman's Fund only "very rarely" conducted any independent investigation of a Dow claim, that "the manner

---

**12.** Dow settled the *Presque Isle* litigation in October 1995 for $375,000. Plaintiffs were seeking unspecified compensatory damages and $20 million in punitive damages.

of investigating Dow claims was to write to the insured and the insured's lawyer for copies of their investigation", Dow Notice Br., Ex. 112 at 112–113, 120, and stating that investigation of a Dow claim meant reviewing Dow's policy, the allegations in the underlying suit, and information Dow had provided regarding the claim, Dow Ex. 111 at 113–14. Dow also presents testimony from Peter Hartz—who had overall responsibility at Fireman's Fund for Dow's claims—that the only time he recalled Fireman's Fund's attempting to conduct interviews of experts and other witnesses in connection with a Dow claim such as this was in its coverage litigation against Dow in the *Sarabond* case. *Id.* at 115–16. Dow also presents interrogatory answers from Fireman's Fund conceding that it "does not believe that any of its employees has visited or inspected any of the Final Sites," and that it "does not believe that it has retained any 'investigators or consultants' regarding any 'coverage determinations' with respect to coverage claims made by Dow, other than those 'investigators or consultants' that Fireman's Fund has retained in anticipation of and during the course of this coverage litigation with Dow." Dow Notice Br., Ex. 118 at Nos. 23, 28.

This Court disagrees with Insurers' position that the above evidence is irrelevant to the inquiry "whether they were prejudiced in deciding whether to act and how to act." *Steelcase*, 1990 WL 92636 at *6. Dow's evidence that Insurers do not independently investigate claims such as those at issue here is relevant to and supports Dow's claim that, outside the context of coverage litigation, there was no decision to make—Insurers simply do not conduct an independent investigation—and thus cannot establish prejudice under these circumstances. This Court likewise disagrees with the holding to the contrary in *Upjohn v. Aetna Casualty*, K88-124CA4 at 9 (W.D.Mich.1988) (unpublished decision).

■■■■ Insurers' claims of prejudice due to a lost opportunity to participate in remediation decisions are similarly undermined by the fact that they did not seek to participate once notified even though the remedial investigation at the Cliffs–Dow former plant site was, at that time, still not completed and the remedial activities had not yet begun. Likewise, Insurers have not established that they were prejudiced, as a matter of law, because Dow collected and removed tarry wastes prior to providing notice. Fireman's Fund asserts, without explanation, that these prenotice activities "hampered" it from "investigating how and when the circumstances took place at the site." *See* FF Prejudice Summary. This is not enough to establish prejudice as a matter of law. As the *Canron* court observed, "[d]elayed notice which interferes with an insurer's ability to evaluate or investigate as to coverage defenses or as to liability, may indeed cause actual prejudice.... However, ... what is lost or changed must be material, and not otherwise available or subject to reasonable reconstruction.... It is not sufficient merely to allege prejudice; an insurer must demonstrate specifics." 918 P.2d at 943. *See also Hoechst*, 684 N.E.2d at 608. Fireman's Fund has not demonstrated the necessary specifics here.

■■■■ Finally, this Court finds that Insurers have not established actual prejudice to their position as a matter of law based on Dow's entry into a 1984 cost sharing agreement with Cleveland–Cliffs and Georgia–Pacific. Insurers' mere assertion that the agreement precluded them from pursuing third party claims is inadequate. Insurers do not identify any third parties they would have pursued and do not explain how this 1984 cost-sharing agreement prejudiced their ability to pursue any such actions.

### h. Conalco Site

■■■■ The Conalco site is located in Madison, Illinois. From 1952 to 1969, Dow operated an extrusion and aluminum-magnesium alloying facility at the site. "From 1969 to 1973, Dow leased the facility to Phelps–Dodge, which continued to operate it as an extrusion and aluminum-magnesium alloying facility. Low level radioactive waste resulting from a thorium-magnesium alloying process and barium slag from the site were disposed of at an adjoining 40–acre parcel, along with chlorinated solvents and waste oils which contained PCB's." FF Notice Br., Ex. 10 at 9. In 1971, Phelps–Dodge Aluminum Company merged with another company and formed Consolidated Aluminum Com-

pany ("Conalco"). FF Notice Br., Ex. 12. "Dow sold the plant and the adjoining 40–acre storage site to Consolidated Aluminum Company in 1973." FF Notice Br., Ex. 10 at 9.

The sole claim at issue here is a February 1986 demand from Conalco that Dow participate in the remediation of contamination at this site so as to avoid a lawsuit by Conalco against Dow. No governmental agency has ever initiated proceedings against Dow requiring either a remedial investigation or remedial activities at this site and no private lawsuit has ever been filed against Dow regarding remediation of this site. FF Notice Br., Ex. 16.

In March 1988, Dow entered into a settlement agreement with Conalco. Dow agreed to remediate the site, to split current remediation costs, to pay half of future costs resulting from any actions brought against either Conalco or Dow seeking money damages, fines, or equitable relief arising out of substances released at the site, and waived any right to pursue an indemnity or contribution action against Conalco. FF Notice Br., Ex. 19. Remediation at the site was completed in December 1992 at a cost of approximately $17 million to Dow. FF Notice Br., Ex. 25; Trav. Notice Br., Ex. 47. Dow notified Insurers of this Conalco claim by virtue of its November 24, 1993 counterclaim in this action.

Travelers (6/1/54—11/19/56) and Fireman's Fund (11/19/56—7/30/70) are the Primary Insurers remaining at risk at this site. Primary Insurers argue that they are entitled to summary judgment as to this site because they have established as a matter of law that they have suffered actual prejudice as a result of Dow's untimely notice of Conalco's 1986 demand. This Court agrees.

Dow's 1993 notice of the 1986 Conalco claim was untimely. Conalco sold the plant facility to Spectralite Consortium, Inc. ("Spectralite") in 1986. Prior to the sale, an investigation of the 40–acre waste site located on Conalco's property revealed contamination. Spectralite refused to buy the 40–acre parcel, it was severed from the rest of the property, and the sale was completed. Conalco retained ownership of the 40–acre waste site adjacent to the plant facility which was then owned by Spectralite. Conalco then approached Dow seeking its assistance in remedying the contamination problems that were found during the pre-sale investigation. FF Notice Br., Ex. 11; Trav. Notice Br., Ex. 47. Accordingly, Dow had knowledge of the Conalco claim in 1986 but failed to notify Insurers until 1993.

Insurers assert that they have established, as a matter of law, that Dow's untimely notice of the 1986 Conalco claim caused them to suffer actual prejudice. This Court agrees. Insurers have established that Dow's delay materially impaired, at the very least, their ability to pursue claims against third parties; i.e., Dow's waiver of claims against Conalco in the 1988 settlement agreement.

 Dow has not persuaded the Court that, under facts such as these where the was no PRP letter and no pending lawsuit, actual prejudice to the Insurers' position can be ignored simply because Dow claims it has obtained a favorable settlement of the Insurers' third-party claims. Dow urges this Court to determine prejudice by focusing on the end result and determining whether or not it is ultimately favorable to Insurers. If the result is favorable, Dow argues, Insurers must indemnify Dow for its unilateral decisions. To adopt Dow's approach, the Court would be forced to ignore the interests protected by the notice and prejudice requirements. This is something it cannot do. The prejudice requirement was created to prevent forfeitures. It is not a vehicle that can be used by the insured or the Court to ignore the protections the notice provisions provide to insurers. No matter how favorable an insured's settlement may prove to be in hindsight, if the insurer shows that the insured's unilateral actions have materially impaired the insurer's ability to contest its liability to the insured or its liability to a third party, then it has established actual prejudice and there is no duty to indemnify.

**i. The PPI Brooklawn Site**

Petro–Processors, Inc. (PPI) operated two waste disposal sites in Baton Rouge, Louisiana. The PPI waste facility, known as the Brooklawn site, was owned and operated by PPI from approximately 1968 or 1969

through 1980. Dow never owned or operated this site. From 1968 until late 1970, PPI disposed of Dow's waste at the Brooklawn site.

Litigation over contamination at the PPI site was initiated in 1970 and continues today. There are five claims at issue here regarding this PPI Brooklawn site: (1) 10/21/70 *Ewell I* lawsuit; (2) 7/1/76 *Ewell II* lawsuit; (3) 7/14/80 EPA lawsuit; (4) 4/96 *Jarvis* lawsuit; and (5) 4/96 *Canal Development Corp.* lawsuit. The *Ewell I* lawsuit, was

finally resolved in January 1979 when the Louisiana Supreme Court denied a writ seeking review of the Court of Appeals' decision reversing judgment against Dow. The *Ewell II* litigation, however, is ongoing. As to the 1980 EPA lawsuit, Dow entered into a Consent Decree in 1984 but claims the matter is ongoing pursuant to the terms of that Consent Decree. The 1996 *Jarvis* and *Canal Development* lawsuits are also ongoing.

Dow asserts Primary Insurers had notice as follows:

| | Claim | Fireman's Fund | Aetna |
|---|---|---|---|
| (1) | 10/21/70 Ewell I lawsuit | 11/10/70 | 11/24/93 (Dow counterclaim) |
| (2) | 7/01/76 Ewell II lawsuit | 7/16/70 | 11/24/93 " " |
| (3) | 7/14/80 EPA lawsuit | 4/14/81, 11/30/81 12/7/81 (internal FF documents indicating knowledge of action) | 11/24/93 " " |
| (4) | 4/96 Jarvis Complaint | 4/17/96 | 4/17/96 |
| (5) | 4/96 Canal Development Complaint | 4/17/96 | 4/17/96 |

Primary Insurers remaining on the risk in this action are: Fireman's Fund (11/19/56—4/1/76) and Aetna (4/1/76—4/1/85). Both have filed motions arguing they are entitled to summary judgment because they have established, as a matter of law, that they were actually prejudiced by Dow's untimely notice of the underlying claim or suit at issue at this PPI Brooklawn site. Fireman's Fund's motion addresses only one claim; the 7/14/80 EPA lawsuit. Aetna's motion addresses three claims: the 10/21/70 *Ewell I* lawsuit, the 7/2/76 *Ewell II* lawsuit, and the 7/14/80 EPA lawsuit. A number of Dow's Excess Insurers have joined in Aetna's motion for summary judgment.

### (1) Fireman's Fund

This Court concludes that Fireman's Fund has not established, as a matter of law, that Dow's delay in providing notice as to the 1980 EPA lawsuit actually prejudiced its position as to that underlying claim. Fireman's Fund's asserts that it did not receive notice of the EPA claim until November 24, 1993 when Dow filed its counterclaim in this action. Dow, however, presents evidence that Fireman's Fund was aware of the EPA action against Dow since early 1981, had subse-

quently been apprized of the status of the action, and was aware of the Consent Decree in early February 1984. *See* Dow Notice Br., Exs. 93, 95, 96, 97, 98. Despite this knowledge, there is no evidence that Fireman's Fund has acted to protect its interests or those of its insured. Thus, even if Dow's notice of the EPA claim was untimely, this evidence precludes the Court from concluding that Fireman's Fund was prejudiced, as a matter of law, as a result of Dow's delay. Michigan courts have observed that prejudice cannot be established "if the insurance company received adequate and timely information" of an occurrence, claim or suit "regardless of the source of the information." *Koski*, 572 N.W.2d at 639 (quoting *Weller*, 330 Mich. at 293, 47 N.W.2d 612). When determining prejudice, Michigan courts also consider "whether the insurer, after receiving late notice, acted promptly to protect its interests and those of its insured." *Upjohn*, 768 F.Supp. at 1205 (citing *Burgess*, 107 Mich.App. at 629–30, 310 N.W.2d 23; *Bibb*, 44 Mich.App. at 446, 205 N.W.2d 495). Dow asserts that the EPA action is ongoing; that soil and groundwater investigations are far from complete and reports have not yet been submitted to the EPA. Dow Notice Br. at 68. Despite evidence of its early awareness of

the EPA action and the continuing opportunity to participate in remedial investigations and decisions even after Dow's November 1993 notice, there is no evidence that Fireman's Fund has made any effort to take advantage of those opportunities. As the *Burgess* Court observed, under circumstances where the insurer fails to act to protect its interests after receiving late notice, "prejudice [is] not attributable, in its ultimate sense, to the insured's failure to give notice of suit, but rather to the insurance carrier's failure to act upon receiving notice." 107 Mich.App. at 629–30, 310 N.W.2d at 25.

### (2) Aetna

■ Aetna asserts that Dow failed to timely notify it of the *Ewell I* and *Ewell II* lawsuits and the 1980 EPA action. This Court agrees. It likewise agrees that Dow's delayed notice, which came after the *Ewell I* action was finally resolved, has prejudiced Aetna by materially impairing its ability to contest its liability to its insured or the liability of the insured to a third party. *West Bay*, 915 F.2d at 1036–37. This Court is not persuaded, however, that Aetna has established prejudice, as a matter of law, as to the ongoing *Ewell II* litigation. Aetna does not offer any specifics as to how it has been prejudiced in this pending action; thus Aetna has not met its burden of showing prejudice.

The Court likewise finds that Aetna has not established, as a matter of law, whether and when it suffered actual prejudice as a result of Dow's delayed notice of the 1980 EPA action. Aetna has not persuaded the Court that Dow's delay in providing notice "caused a loss of investigatory/documentary evidence relating to the condition" of the site, "or that any loss of such evidence has made it impossible for [Aetna] to make an adequate investigation" as to the site and "its hazardous waste problems." *Christopher*, 1992 U.S. Dist. LEXIS 21640 at *6.

■ Furthermore, Aetna has not persuaded the Court that it should find, as a matter of law, that Dow's pre-notice entry into a consent order with the EPA caused it actual prejudice by materially impairing its ability to contest its liability to Dow, Dow's liability in the EPA action, or its ability to bring contribution or subrogation claims. Aetna has not presented the Court with evidence that the 1984 EPA consent order cannot be modified, that it has had no opportunity after notice to participate in remedial decisions, that it took advantage of any such opportunity after notice, or that it is unable to adequately contest its liability here for pre-notice remedial decisions in the EPA action.

Although the Michigan courts have not yet addressed this issue, courts in other jurisdictions have observed that an insured's pre-notice acknowledgment of liability and agreement to remediate contamination is not sufficient to find actual prejudice, as a matter of law, when the underlying litigation involves claims based upon strict liability environmental laws such as those at issue here. *See Chemical Leaman*, 89 F.3d at 997; *Canron*, 82 Wash.App. at 486, 918 P.2d 937 (1996) (where the court observed that "the insurer must demonstrate some concrete detriment resulting from the delay which harms the insurer's preparation or presentation of defenses to coverage or liability"); *Hoechst*, 684 N.E.2d at 608 (where the court, under facts similar to those presented here and involving this same site, refused to "accept as a generalization that an insured's assumption of liabilities before (delayed) notice is in itself conclusive that the insurer has been prejudiced .... The issue of prejudice by reason of these [consent and settlement] agreements is one of fact"). As the Michigan Supreme Court has observed, "[d]efenses to CERCLA liability are virtually nonexistent;" "the EPA may implement any investigatory and remedial action it deems necessary at the site, subject only to an abuse of discretion review;" and "[t]he EPA's powers may also be viewed as coercing the 'voluntary' participation of PRPs." *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 519 N.W.2d 864, 871 n. 14, 871, 872 (1994). Thus, on its motion for summary judgment, Aetna has not met its burden of establishing prejudice sufficient to avoid its duty to provide indemnification as to this EPA claim.

### j. Dow's Notice to Excess Insurers at the PPI and Conalco Sites

■ The London Excess Insurers have joined Travelers/Aetna's motion for summary

judgment asserting that they were prejudiced by Dow's late notice at the PPI and Conalco sites and are seeking to avoid indemnification coverage at these sites. These Insurers argue that Dow violated its own internal procedures for notifying excess insurers when a claim is valued at over one-half the amount of the limits of primary coverage; i.e., over $1.25 million as to Fireman's Fund policies and $2.5 million as to Aetna primary policies. Accordingly, the London Excess Insurers argue Dow should have notified them about Conalco claim by at least 1987 and about the U.S. EPA claim at the PPI site in 1983 because by those dates Dow knew it had multi-million dollar exposures.

As to Conalco, the London Excess Insurers argue that the evidence shows notice was at least 6 years late because by 1987 Dow knew: (1) the facts which Dow claims constituted an "occurrence;" (2) that it would share the costs of cleanup and thus was aware of its "liability" to Conalco; (3) costs would be over $15 million; and (4) its share of expenses could be as high as 50 times the limits of its highest primary policy. Remediation at the Conalco site was completed in December 1992 at a cost to Dow of approximately $17 million.[13]

As to PPI, the London Excess Insurers argue that Dow's notice was as least 10 years late because by 1983 Dow knew: (1) the facts which it claims constituted an "occurrence;" (2) it faced liability for cleanup costs in the 1980 EPA suit; (3) it would pay 16.5% of those cleanup costs; (4) costs were estimated at over $26.6; and (5) Dow's share would exceed the limits of its primary coverage in any given year.

Dow asserts that, although the Excess Insurers purport to "join" in the primary insurers' motions, their policy language requires a different analysis.[14] This Court agrees. The excess policies generally provide that notice is not required unless the insured concludes that the policies are likely to be implicated.

For example, the vast majority of London Excess policies; i.e., those in effect from 5/31/58 through 12/1/86, provide that Dow is to give notice when it "has information from which [Dow] may reasonably conclude than an occurrence covered herein involves injuries or damages which, in the event that [Dow] should be held liable, is likely to involve this Policy." London Excess Insurer's Br., Ex. H. These policies also contain a saving provision which provides that "failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, *shall not prejudice such claims.*" *Id.* (Emphasis added). (applicable to all policies except those in effect from 2/14/56—5/31/58).

The London Excess Insurers oversimplify the issue of Dow's notice requirement by focusing solely on estimated dollar amounts for remediation. There is record evidence, as these Insurers concede, that Dow had "evaluated coverage issues" and had determined, at the time of its happening, that coverage for these occurrences at Conalco and PPI was not available. Moreover, despite Dow's internal policies, Dow is not required under the language of its policies to give notice to Excess Insurers until it reasonably concludes that the excess policies at issue are likely to be implicated. Dow's excess policies are not reached unless and until its primary policies have been exhausted. Excess Insures have not established, as a matter of law, that Dow knew in 1987 that the Conalco claim would exhaust its primary policies or that Dow knew in 1983 that the PPI claim would exhaust its primary policies. Rather, this Court concludes that questions of material fact exist regarding when Dow should have reasonably concluded that its excess insurance policies were likely to be implicated and when Dow should have provided notice to its excess insurers. *See Hoechst,* 684 N.E.2d at 607.

13. In light of this Court's 4/10/98 Mem. Op. and Dow's concession that there were no sudden and accidental events at the Conalco site, the London Excess Insurers' policies issued after 3/31/71, which contain a pollution exclusion with a sudden and accidental exception, are no longer at issue here.

14. Only the AIG Insurers, Continental Casualty, and the Century "Certain Defendants" have joined the London Excess Insurer's briefs, and thus offered discussion of the different analysis applicable to excess insurance policies. Motion joinders by Centennial Insurance, Interstate Fire & Casualty, and Nationale–Nederlanden Schadeverkeing Maatschappig do not discuss this issue.

The Court's conclusion is supported by the *Hoechst* court's observations that "[w]ith multiple sites, multiple insurers, and multiple policies providing various layers of excess insurance for varying periods of time," it is important to recognize that "the terms of the notice clauses of the excess policies need to be sharply distinguished from the notice provisions of primary policies." 181 Ill.Dec. 531, 608 N.E.2d at 605. As the *Hoechst* court further observed, notice provisions with "rubbery" language, like that found in the vast majority of the London Excess policies, "results in giving the insured some leeway or discretion in forming a judgment about when excess protection is implicated." 684 N.E.2d at 606. Moreover,

> this looseness responds to the realities of the situations that must often confront the policyholders in these environmental cases. Take remediation. The nature and causes of environmental threats may not be instantly apparent. The contemplated costs of cleanup may vary as findings are progressively made and technical analysis proceeds. The unexpected regularly obtrudes. The attitudes and requirements of regulatory agencies are not constant and the changes and variations must affect the estimates.

*Id.*

## B. Cross Motions Regarding the "Voluntary Payment" Prohibition

Fireman's Fund also brings a motion for summary judgment asserting that Dow is not entitled to indemnification because Dow breached the voluntary payments clause of its policies with regard to claims at each of the Final Sites, except Brookhurst, Hartley & Hartley and Silresim.[15] Fireman's Fund argues that: (1) Dow acted "voluntarily" and thus breached this provision when it accepted liability and made payments in connection with governmental agency "suits" or third party litigation without first notifying Fireman's Fund or obtaining its written consent; (2) Dow also acted "voluntarily" and thus breached this provision when it made payments and accepted obligations where there was no governmental agency "suit" or third party litigation pending; (3) Insurers are not required to show they suffered actual prejudice as a result of Dow's voluntary payments; and (4) even if required to do so, Insurers have shown they were actually prejudiced by Dow's voluntary payments.

Dow has filed a cross motion on this issue asserting that: (1) the sole issue with respect to the voluntary payments provision is whether Dow's payments were "voluntary;" not whether notice was timely; (2) Dow's payments at the 10 Final Sites were in response to legal obligations and thus were not voluntary; (3) even if its payments are construed to be "voluntary," Michigan law will require Insurers to establish that Dow's actions caused them material prejudice, and Insurers cannot do so.

This Court DENIES Fireman's Fund's and Dow's cross-motions for summary judgment. It predicts that the Michigan Supreme Court would not construe the term "voluntarily" in the voluntary payment provision as Dow urges—by examining the nature of the insured's legal obligation in the underlying action. The Court further concludes that, although Insurers have established that Dow breached the voluntary payment clause, the Michigan Supreme Court will require Insurers to establish actual prejudice before allowing them to avoid indemnification coverage, and questions of material fact exist regarding prejudice.

---

**15.** Fireman's Fund's motion has been joined by Travelers/Aetna, Century Indemnity, First State, Highlands and Interstate Fire & Casualty.

Travelers/Aetna's Joinder asserts that Dow is not entitled to any indemnification under any of its policies because it voluntarily made payments before notifying Travelers of its claims involved at all ten of the Final Sites.

Zurich has filed a joined to Fireman's Fund's Reply and has filed a memorandum claimed to be in support of its cross-motion on the voluntary payment provision. *See* Opp. and Mem. in support of Zurich Ins. Co.'s Cross–Motion for Partial Summary Judgment on the Voluntary Payment Provision. Zurich, however, has not filed a cross-motion for summary judgment and has not joined in Fireman's Fund's motion for summary judgment on voluntary payments. Moreover, rather than address the voluntary payment issued raised in Fireman's Fund's motion, Zurich's memorandum essentially reargues the pretender defense cost issued previously decided by the Court.

## 1. Construction of the "Voluntary Payment Provision"

■ The voluntary payment provisions in Dow's policies provides that "[t]he insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expenses other than for first aid to others at the time of accident." [16] *See* FF Vol. Br. at 2 (contained in 7/30/70–4/1/76 policies); Travelers/Aetna's Vol. Joinder at 1. Fireman's Fund's earlier policies, which were in effect from 11/19/56 to 1/1/69, have slightly different language. These policies provide that "[t]he insured shall not, except at the insured's own cost, voluntarily make any payment, assume any obligation or incur any expense, other than for such immediate medical and surgical relief to others as shall be imperative at the time of an occurrence, *without the written consent of the Company.*" FF Vol. Br. at 2 (emphasis added).

Fireman's Fund argues that the purpose of the voluntary payment clause, similar to the purpose of the notice and cooperation clauses, is to give the insurer the opportunity to protect its interests by participating in claims handling and settlement negotiations and to prevent collusion. Accordingly, Fireman's Fund argues, it is not obligated to indemnify an insured's unilateral decision to: (1) respond to a suit or claim (a "legal obligation") before notifying the insurer or obtaining the insurer's consent; or (2) make payments and/or accept obligations where no suit or claim is pending against the insured. *See Augat, Inc. v. Liberty Mutual Ins. Co.,* 410 Mass. 117, 123, 571 N.E.2d 357, 361 (Mass. 1991) (where the court rejected the insured's argument that its settlement with the state prior to giving notice to the insurer was not "voluntary" because it had a choice—it had the right to demand that the insurer defend and assume the obligation to pay for the clean-up). Adoption of Dow's approach, Fireman's Fund asserts, will defeat the purposes the voluntary payment provision is designed to protect.

Dow responds that Fireman's Fund's arguments are based on a faulty premise; i.e., that Dow's notice to its insurers is relevant to whether its payments were voluntarily made. The voluntary payment clause does not mention notice to the insurer. Rather, it provides that the insured shall not, except at its own cost, "voluntarily" make any payment, assume any obligation, or incur any expenses. The term "voluntarily" must be construed in accordance with its ordinary meaning. Thus, Dow asserts, this Court should recognize that the voluntary payment clause addresses the voluntary or involuntary nature of the payment made, the obligation accepted, or the expenses incurred; not their timing.

The Court agrees that its interpretation of the "voluntary payment" provision is to be guided by its plain, ordinary meaning, and, furthermore, that "it is customary to turn to dictionary definitions" to construe an insurance policy term. *Bronson Plating,* 445 Mich. at 567–68, 519 N.W.2d at 868–69. The dictionary defines "voluntarily" as "of one's own free will or accord; without compulsion, constraint, or undue influence by others; freely; willingly." Oxford English Dictionary (2d ed.1989). *See also* Webster's New World Dictionary of the American Language (2d college ed.1984) (defining "voluntary" as "acting or done without compulsion or persuasion"); Black's Law Dictionary (6th ed.1990) (defining voluntary as "unconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself .... Resulting from free choice, without compulsion or solicitation").

Dow extrapolates from these definitions the conclusion that the voluntary payment clause prohibits an insured from making payments, assuming obligations or incurring expenses only where there is "no legal basis for the insured to incur the liability." Dow Br. at 3. It urges this Court to define "voluntarily" by examining the nature of the underlying claim; i.e., whether it involves a legal obligation which provides the insured with no choice but to respond. The Court is not persuaded by Dow's arguments. While it is true that the term "voluntarily" must be given its plain, ordinary meaning, that term

---

**16.** First State, Highlands, Interstate Fire & Casualty, and Nationale–Nederlanden Schadeverkering Maatschappig, in their Joinders, set forth no evidence demonstrating that their policies contain a "voluntary payment" provision. Accordingly, this Court is unable to consider the merit of their Joinders.

must also be construed in a manner that considers the contract as a whole, gives meaning to all its terms, and gives effect to the parties' intent as discerned from the policy's language. *Auto–Owners v. Churchman,* 440 Mich. 560, 566, 489 N.W.2d 431 (1992).

Dow's approach disregards the fact that the insured has other options under circumstances such as those presented here; i.e., the option to demand that its insurers participate in the matter for which it seeks coverage or the option to at least notify its insurers in advance of taking actions for which it later seeks indemnification. Dow's approach leaves the Court without a vehicle to ensure that the insurers' rights, which the voluntary payment clause is designed to protect, are not materially impaired. Once payments, expenses or assumed obligations are deemed "involuntary," there is no mechanism to screen for collusion, fraud, or to examine whether the insurers' interests were adequately protected by the insured's unilateral decisions.

In *Coil Anodizers, Inc. v. Wolverine Ins. Co.,* 120 Mich.App. 118, 120, 123–24, 327 N.W.2d 416, 417, 418–19 (1982), the court found that the insured's settlement of a claim was voluntary because it was made despite the fact there was no pending lawsuit and no legal obligation to pay. The court in *Coil Anodizers* further observed, however, that the insurer had "bargained for the contractual right to contest the liability of its insured instead of having its money given away by an agreement to which it was not a party." *Id.* at 418. The court emphasized that "[t]he purpose of such clauses is to prevent collusion between the claimant and the insured and to give the insurer control over settlement negotiations." *Id.* Accordingly, a careful reading of *Coil Anodizers* reveals that the court based its decision not on the absence of a legal obligation but on the recognition that the insured cannot act in a way that disregards the insurer's interests which the voluntary payment provision is designed to protect.

An approach that respects the voluntary payment provision's purpose and intent is found in *Cessna Aircraft Co. v. Hartford Accident & Indemnity Co.,* 900 F.Supp. 1489 (D.Kan. 1995). *Cessna* involved a declaratory judgment action brought by the insured against its liability insurers regarding coverage for groundwater contamination. One of the comprehensive liability insurers had a policy with language substantially similar to that involved here; i.e., it "required that Cessna 'cooperate with the company and assist in making settlements' and prohibit[ed] Cessna from voluntarily making any payment, assuming any obligation or incurring any expense other than for 'first aid to others.'" *Id.* at 1516. The insurers there, like Insurers here, claimed that Cessna breached the voluntary payment provision "when it entered into settlements and agreed to certain remediation costs without the consent of the moving insurers." *Id.* at 1517. The *Cessna* court agreed with the insurers that Cessna had breached this clause. In response to arguments similar to those Dow invokes here, the court observed that "[a]lthough the pressure to respond in a CERCLA case creates an atmosphere in which the insured's actions in settling may be arguably more coerced (or even prudent) than in other settings, Cessna's actions were voluntary in that it had a choice—it could have made a demand on these insurers to participate or at the very least informed these insurers in advance of its actions." *Id.*

The *Cessna* court then considered the appropriate consequence of Cessna's breach. It observed that, although no Kansas case had squarely addressed "the legal effect of a breach of a voluntary payment provision," the Kansas courts required insurers to show prejudice before relieving them of their obligation to provide coverage in the event of a breach of similar policy provisions; i.e., the notice and cooperation provisions. *Id.* Finding the reasoning in a recent decision from the New Mexico Supreme Court to be persuasive, the *Cessna* court concluded that "[a]bsent a showing of prejudice in addition to breach, coverage in this case would be unfairly forfeited and the insurers would appear to receive a windfall." *Id.* at 1518 (discussing *Roberts Oil Co., Inc. v. Transamerica Ins. Co.,* 113 N.M. 745, 751, 833 P.2d 222, 229 (1992)). The *Cessna* court further observed that "[p]articularly in a CERCLA case such as this, where the settlement and costs incurred are perhaps less 'voluntary'

than is ordinarily associated with an insured's settlement or assumption of costs, it seems particularly unfair to permit breach of such provisions to preclude coverage absent a showing of prejudice to the insurer." *Id.* at 1518.

## 2. Dow's Breach of the Voluntary Payment Provision

This Court predicts that the Michigan Supreme Court would adopt a similar approach here. Applying that approach, this Court finds that Dow breached the voluntary payment provision in its policies "when it entered into settlements and agreed to certain remediation costs" without notifying or obtaining the consent of its insurers. *Cessna,* 900 F.Supp. at 1517. Specifically, Dow breached the voluntary payment provision when: (1) at the Cliffs-Dow site, it entered into a May 1984 cost-sharing agreement with Cleveland-Cliffs and Georgia-Pacific; investigated the site for contamination in 1985; and undertook additional remedial activities in 1989; (2) at the Daffron & Pinion site, it responded to the State of Georgia's April or May 1987 notice and investigated the site for contamination; and entered into an August 1988 Corrective Action Order; (3) at the PPI site, it responded to the 1980 EPA lawsuit and entered into a 1984 Consent Decree; and (4) at the Silresim site, it responded to the EPA's 8/22/83 PRP letter and the EPA's 5/8/89 demand letter.[17]

Finding that Dow breached the voluntary payment provision does not end the Court's inquiry, however, since the Court predicts that the Michigan Supreme Court, like the court in *Cessna,* will require Insurers to establish actual prejudice before allowing them to avoid their duty to indemnify.

## 3. Insurers Must Establish Prejudice To Avoid Indemnification

This Court has previously recognized that it is a well-established principle of Michigan law that untimely notice will not excuse an insurer's obligation to indemnify unless it can prove it was actually and materially prejudiced by the insured's delay. *Wendel,* 384

Mich. at 478-79, 185 N.W.2d at 353. In *Wendel,* the Michigan Supreme Court examined the purpose of the notice provision; i.e., to "allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims", and adopted a rule that would not allow an insurer to avoid its duty to indemnify under the insurance contract unless it could show that these interests were prejudiced by the insured's late notice. *Wendel,* 384 Mich. at 477, 185 N.W.2d 348.

Michigan courts have likewise required an insurer to demonstrate prejudice before invoking the cooperation clause to avoid coverage. *Anderson v. Kemper Ins. Co.,* 128 Mich.App. 249, 253-54, 340 N.W.2d 87, 90 (1983) (cooperation clause defense requires showing of prejudice); *Action Auto Stores, Inc. v. United Capitol Ins. Co.,* 845 F.Supp. 417, 422 (W.D.Mich.1993) (same); *Allen v. Cheatum,* 351 Mich. 585, 596-97, 88 N.W.2d 306, 312 (1958)(same).

The same reasoning for requiring insurers to show prejudice under the notice and cooperation clauses applies with equal force to the voluntary payments provision. As the court in *Roberts Oil* observed in rejecting the insurers' attempt to distinguish the voluntary payment and cooperation provisions, "this distinction is one without a difference." 833 P.2d at 228. The court first observed that the purpose of a cooperation clause is to prevent fraud or collusion and to protect the insurer's interests, and "[s]ince the reason for such a clause is fear of prejudice to the insurer, it is reasonable to require a showing of prejudice." *Id.* at 229 (internal quotes and citation omitted). The court next observed that the purpose of the voluntary payment provision is the same, and thus it is reasonable to similarly require the insurer to show prejudice. *Id.*

Furthermore, as Dow points out, the prejudice requirement prevents a breach of the voluntary payment clause from working a complete forfeiture and totally barring cover-

---

17. The Court's decision on late notice makes it unnecessary for it to consider arguments regarding Dow's "voluntary" conduct as to claims involved at the Harris/Farley Street and Conalco

sites. The Court also need not address claims previously dismissed with regard to the Brookhurst, Midland and Monahans, Texas final sites.

age. As counsel for Fireman's Fund expressly admitted to this Court at an earlier hearing, "the reason prejudice is a requirement on notice is because notice works a complete forfeiture of the contract. You don't provide notice, you are out. You get nothing. And the courts bend over backwards in every jurisdiction to prevent complete forfeiture." Tr. 10/28/97 Hrg. at 76.

In light of the above, this Court predicts that the Michigan Supreme Court would adopt a rule that requires insurers to show that their interests have been prejudiced by an insured's voluntary assumption of an obligation or voluntary payments before allowing insurers to avoid their obligation to indemnify.

### a. Insurers Have Not Established Prejudice As a Matter of Law

Insurers' prejudice arguments here do not add to the prejudice arguments discussed above in the context of their late notice arguments. Thus, to the extent that the Court found prejudice there, the same analysis applies here; and to the extent that the Court found that the Insurers had not established prejudice as a matter of law, the same analysis applies here. Because questions of material fact exist on the issue of prejudice, the Insurers' and Dow's cross-motions for summary judgment on voluntary payment are denied.

### III. Conclusion

For the above stated reasons, this Court DENIES Zurich's motion for summary judgment on late notice; GRANTS IN PART and DENIES IN PART Fireman's Fund's motion for summary judgment concerning Dow's failure to comply with notice provisions; GRANTS IN PART and DENIES IN PART Travelers/Aetna's counter-motion for summary judgment based on the late notice provisions in its policies; DENIES the London Excess Insurers' request in their joinder for summary judgment based on the late notice provisions in their excess policies; DENIES Fireman's Fund's motion for summary judgment on voluntary payment and

DENIES Dow's cross-motion for summary judgment on the issue of voluntary payment.